467 F.2d 226
 Edna ROTHSTEIN et al., Plaintiffs-Appellees,
v.
George K. WYMAN, as Commissioner of the Department of Social
Services of the State of New York, and the
Department of Social Services of the
State of New York,
Defendants-Appellants.
 No. 812, Docket 72-1359.
 United States Court of Appeals,
Second Circuit.
 Argued May 12, 1972.
Decided Sept. 7, 1972.
 
 M. James Spitzer, Jr., New York City (Leonard S. Clark, Nassau County Law Services Committee, Westbury, N. Y., Norman B. Lichtenstein, The Legal Aid Society of Westchester County, White Plains, N. Y., of counsel), for plaintiffs-appellees.
 Amy Juviler, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for defendants-appellants.
 Before FRIENDLY, Chief Judge, and McGOWAN* and TIMBERS, Circuit Judges.
 McGOWAN, Circuit Judge:
 
 
 1
 The challenge to the decree of the District Court presently before us relates only the remedial provisions of that decree which direct the retroactive payment of public assistance benefits in respect of certain periods in 1969. The welfare programs in question entail the use of both state funds and federal grants. Looking to the statutory scheme which embodies that cooperative approach, we conclude that it was not an appropriate exercise of general equity jurisdiction for a federal court to compel the payments in question. We are also of the view that, in any event, federal jurisdiction to grant such relief is foreclosed by the Eleventh Amendment. Accordingly, we reverse.
 
 
 2
 * This litigation derives from a geographic differential in the amount of aid payments in New York City, on the one hand, and a seven-County area adjoining it, on the other. Before July 1, 1969, the Department of Social Services of New York administratively prescribed the standards of assistance, dividing the state into three areas and establishing differentials between them. In April of 1969 the legislature enacted a statute (Social Services Law, McKinney's Consol.Laws, c. 55, Sec. 131-a) which divided the state into four districts, effecting a separation of New York City from the neighboring seven-County area and fixing the figure of $208 (family of four) for the one and $183 for the other. Within a month this statute was amended to empower the Commissioner of Social Services to raise one or more of the other districts up to New York City's level upon a finding by him that the costs of the items of need are above the statutory prescriptions. On June 5, 1969, the Commissioner exercised this authority by a regulation which raised the seven-County allowances from $60 to $65 for an individual, and from $183 to $191 for a family of four (as compared with $70 and $208, respectively for New York City).
 
 
 3
 Shortly after this action by the Commissioner, this litigation was initiated by residents of the seven-County area on behalf of all recipients of assistance under the category of Aid to the Aged, Blind and Disabled (AABD). The complaint asserted that Section 131-a was in conflict with (1) the Social Security Act and regulations issued under it, 42 U.S.C. Secs. 602(a)(1) and 1382(a)(1), 45 C.F.R. Sec. 233.20, and Part II, Sec. 40000 et seq. of the Federal Handbook of Public Assistance, and (2) the Equal Protection Clause of the Fourteenth Amendment. A declaration of the invalidity of the New York statute was sought on these grounds, as was also, on the first of such grounds, an injunction against its enforcement. No reference was made to retroactive payments.
 
 
 4
 Plaintiffs moved for the convening of a three-judge court, which was done. On August 4, 1969, that court, finding that plaintiffs were likely to succeed in their claim that Section 131-a violated the Equal Protection Clause, stated its purpose to issue a preliminary injunction against the enforcement of Section 131-a "other than according to objective, non-discriminatory standards based upon the cost of the needs . . ." 303 F.Supp. 339, 351. An injunctive order was signed September 12, 1969, with its effective date fixed as October 1, 1969. Intervention was then sought on behalf of seven-County recipients of assistance under the program for Aid to Families with Dependent Children (AFDC). This was granted by an order of October 22, 1969, which extended the preliminary injunction to include them as of November 1, 1969.
 
 
 5
 On appeal to the Supreme Court, reversal ensued. Wyman v. Rothstein, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970). The Court stated that its recent decision in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), dictated that the statutory grounds alleged in the complaint should have been determined in advance of the constitutional issue. Accordingly, it directed that "the judgment of the District Court is vacated and the case is remanded to that court for an opportunity to pass on the propriety of granting interim relief in accordance with conventional equitable principles on the basis of [the] statutory claims, or, if the question is reached, continuing the present injunction in light of this Court's decision in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491."[1]
 
 
 6
 When the injunctive order of the three-judge court became effective on October 1, 1969 for AABD recipients, and on November 1, 1969 for AFDC recipients, the Commissioner complied by raising the payments in the seven-County level to the level of those in New York City; and they have been the same ever since by virtue of a voluntary stipulation by the Commissioner in the District Court, upon remand from the Supreme Court, to maintain equality pending final determination of the merits. The three-judge court remanded the case to a single judge for hearing and determination of the statutory claim; and, by agreement, the merits were determined on the motion for preliminary injunction.
 
 
 7
 In addressing the merits, the District Court, 336 F.Supp. 328, considered that there were two questions for it to decide. One was whether there was evidence of cost differences supporting the disparity in payments; and the other was whether, if no such cost justification was apparent, the differential was in conflict with the Social Security Act and regulations issued under it. It found against appellants on both issues; and that determination is not challenged on this appeal.
 
 
 8
 With respect to the relief to be given, the court professed to some difficulty in resolving the conflicting contentions. It was appellants' submission that the only available remedy was to terminate the further receipt by the state of federal funds. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Appellees urged that the court should, by injunctive order, restrain appellants from continuing to enforce Section 131-a. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). The court characterized the Supreme Court's decision in Rosado as holding that "where the cost of compliance with federal requirements is 'massive' and the state plan does not have a 'discrete and severable provision whose enforcement can be prohibited' the appropriate relief is for the court to order the cutoff of federal funds. . . ."
 
 
 9
 Concluding that it was "in a gray area somewhere between King and Rosado," the District Court reasoned as follows:
 
 
 10
 1. The Section 131-a schedules "are not as clearly severable from the state plan as was the definition of 'parent"' in King v. Smith.
 
 
 11
 2. The schedules are, however, "more discrete than the state plan involved in Rosado."
 
 
 12
 3. Although the cost to the state of equalizing the payments of the 125,000 AFDC and AABD recipients in the seven-County area with those of New York City "will result in a substantial cost to the state," this increase "will be nowhere near the cost involved in Rosado."
 
 
 13
 4. These facts on balance bring this case closer to King than Rosado; and this finding, when coupled with the severe consequences generally of a termination of federal grants, "makes the injunctive remedy the more appropriate."
 
 
 14
 5. This case is also distinguishable from Rosado because the legislature's amendment of Section 131-a to authorize the Commissioner to raise the payments in the seven-County area reflects a purpose to continue the programs despite the possibility of higher future payments in compliance with federal requirements.
 
 
 15
 Thus the court resolved its dilemma by saying that it "adopts the relief granted by the three-judge court and restrains the defendants 'from further enforcement or implementation of Sec. 131-a . . . or from promulgating schedules of grants and allowances of public assistance, or making payments thereof to recipients, other than according to objective, nondiscriminatory standards based upon the cost of the needs of such recipients' . . ."
 
 
 16
 The court's decision was forthcoming on December 7, 1970. On January 29, 1971, appellees submitted an order which embodied this prospective injunctive relief. But they went further, and included provisions which required appellants (1) to recompute, by reference to the New York City levels, the payments to all recipients in the seven-County area between July 1, 1969, and October 1, 1969 (AABD) and November 1, 1969 (AFDC), and to remit the differentials; and (2) to give notice to all persons who during the periods in question had applied for assistance and been denied it for lack of eligibility under the lower schedules of Section 131-a that they would now be held eligible upon application within 60 days and entitled to receive payments under the higher schedules from the date of their originally unsuccessful applications. Appellants promptly submitted a counter-order omitting any provision for retroactive payments, and a supporting memorandum which estimated the direct cost of such payments at $2,500,000, and alluded to the heavy administrative costs and dislocations involved in trying to ascertain them.
 
 
 17
 The matter remained in this posture for a year until, on February 8, 1972, the court entered an order and judgment in line with that submitted by appellees. Appellants then sought, by a show cause order issued February 18, 1972, to alter the judgment by deleting the provisions for retroactive payments. Supporting that order was an affidavit by a Deputy Commissioner in charge of operations. He estimated that there were 49,000 eligible cases of former and current recipients, involving payments totalling $1,200,000 and an additional $470,000 in administrative costs. For cases of denied applicants, it was estimated that benefits of $4,000 would be paid at an administrative cost of $50,000.
 
 
 18
 The District Court denied the motion to alter in a memorandum opinion and order dated February 25, 1972. Although it asserted "the complexity of the issue of retroactivity" as one of the reasons for the long delay in the entry of final judgment, it purported to have no doubts about the propriety of the retroactive award. It characterized the estimates of administrative costs, although not the benefit payments, as "conclusory," but went on to say that the burden of administrative costs could never justify a failure to make retroactive payments because to do so would invariably immunize the state from being compelled to make such payments, and would only encourage the state to violate "constitutional and statutory strictures" until it was enjoined from doing so. As to the payments themselves, the court said that it had earlier awarded them "because the plaintiffs were legally entitled to the unpaid assistance, and because to hold otherwise would be to sanction defendants' lawless conduct," citing Gaddis v. Wyman, 304 F.Supp. 713, 717 (S.D.N.Y. 1969), aff'd sub nom., Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970), and Thompson v. Shapiro, 270 F.Supp. 331 (D.Conn.1967), aff'd, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The court also found support in the fact that "defendants, themselves, filed an affidavit before the three-judge court which originally heard the case opposing grant of a preliminary injunction on the ground that plaintiffs could not be irreparably injured because retroactive payments could always be made."
 
 
 19
 A stay pending appeal was simultaneously denied by the District Court. Such a stay was, however, issued by a panel of this court ten days later.II
 
 
 20
 We approach the issues raised on this appeal in the consciousness that the Supreme Court has lately reminded us once again that public assistance programs of the kind in question here reflect a "scheme of cooperative federalism," Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (decided May 30, 1972), quoting King v. Smith, 392 U.S. 309, 316, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); and that, as the Court said in Dandridge v. Williams, note 1 supra, it is not for the federal courts "to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." P. 487 of 397 U.S., p. 1163 of 90 S.Ct. A state is not legally obligated to participate in such programs; if it does, it must comply with federal requirements if it is to assure the continued availability to it of federal funds to defray a part of the total expense of assisting its needy citizens. Federal matching grants have long been recognized as exerting pressures upon the freedom of action of the states; and the federal-state relationships created by the acceptance of such funds by the poorer partners are peculiarly subject to the strains inherent in a federalist structure of government. It is not the business of the federal courts needlessly to exacerbate those problems.
 
 
 21
 The closely related litigation in Rosado v. Wyman (supra, p. 29) is, we think, singularly instructive on this score. That was a challenge to the same New York statute as is here involved, and it was launched only a few days after Section 131-a was enacted. AFDC recipients in the seven-County area brought suit in the Eastern District of New York, raising both statutory and constitutional issues. One of the claims was precisely that advanced in this case, namely, that differentials in payment between New York City and the seven-County area violated both the Social Security Act and the Equal Protection Clause. The latter issue was considered by a three-judge court to have been mooted by the May, 1969 amendment of Section 131-a, and, accordingly, the constitutional issue disappeared from the case.
 
 
 22
 The litigation eventually reached the Supreme Court where it was held that Section 131-a did violate Section 402(a)(23) of the Social Security Act, 42 U.S.C. Sec. 602(a)(23). The disposition made of the case by the Supreme Court was to remand it to the District Court
 
 
 23
 "to fix a date that will afford New York an opportunity to revise its program in accordance with the requirements of Sec. 402 [(a)(23)] if the State wishes to do so. The District Court shall retain jurisdiction to review, taking into account the views of HEW should it care to offer its recommendations, any revised program adopted by the State, or, should New York choose not to submit a revamped program by the determined date, issue its order restraining the further use of federal monies pursuant to the present statute." Pp. 421-422 of 397 U.S., p. 1222 of 90 S.Ct.
 
 
 24
 The New York Legislature responded by further amending Section 131-a, effective June 1, 1970, to reflect a new standard of assistance in New York City. The District Court on remand considered the merits of the revised program. It found that the levels of assistance provided under it in New York City were in conformity with the federal requirements, but it regarded payments being made at lower levels as inadequate.[2] Accordingly, it permanently enjoined New York from continuing to receive or to use federal funds in the AFDC program unless and until it raised the upstate levels of assistance in accordance with the New York City schedule. 322 F.Supp. 1173. We affirmed that decision in all respects, 437 F.2d 619, and the Supreme Court did the same in summary fashion. 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971).
 
 
 25
 What is of present relevance in this later history of Rosado v. Wyman is the disposition made by the District Court of a request by plaintiffs on remand that the court's equity powers be exercised to compel the payment by the state to the AFDC recipients of the differences between what they had in fact received as compared with what they would have received if the federal requirements had been complied with since July 1, 1969.
 
 
 26
 The District Court in Rosado refused this relief. It relied in this regard upon the fact that the Supreme Court had given New York the option of either continuing to participate in the AFDC program by devising a new plan conformably to federal standards, or of foregoing the further use of federal funds. As the District Court put it, "[c]oncern over the strong implications for federalism implicit in congressional decisions to encourage state administered AFDC programs undoubtedly motivated the Supreme Court to emphasize that the State was to be given a choice." If, said the District Court, "a remedy for underpayments had, in a sense, vested, this limitation on the district court's power would have been inappropriate." Pp. 1195-1196 of 322 F.Supp.
 
 
 27
 The District Court went on to say that it could of course theoretically condition its order so as to require the state to refund the federal monies spent in its AFDC program since July 1, 1969 "unless it now paid back the millions of dollars it has improperly denied AFDC recipients." It concluded, however, that this would not realistically give the state the freedom of choice which the Supreme Court quite evidently thought to be within the contemplation of Congress in its statutory formulation of the grant-in-aid welfare programs.
 
 
 28
 This resolution by the trial court in Rosado of the retroactive payments issue was not challenged on appeal, and thus neither we nor the Supreme Court were called upon to deal with it in the appeal which did come up. Appellees seek to discount its relevance to the instant appeal by stressing the difference in the remanding language used by the Supreme Court in the two cases. We are not persuaded that this has overriding significance. After all, it was the general "equity powers" of the court which the plaintiffs in Rosado invoked as the foundation of the retroactive payments which they asked the court to compel, whereas the Supreme Court said in remanding this case that its purpose was to provide the trial court with an opportunity to consider interim relief "in accordance with conventional equitable principles on the basis of [the] statutory claims . . ."
 
 
 29
 Statutory violations-and only statutory violations-were found in both cases on remand, and each set of plaintiffs sought the additional remedy of retroactive payments over and above the injunctive relief afforded them. We do not believe that the one district court, in refusing that request, was literally bound to do so by the terms of the remand, whereas the other court could grant the request because it was under no comparable express inhibition. In neither case does it appear that the Supreme Court had consciously fashioned its remanding language with reference to the possibility that the plaintiffs on remand might seek the added remedy of retroactive payments. The difference in result rather reflects, in our view, differing conceptions by the two courts of what constitutes an appropriate exertion of the extraordinary powers of equity in the federal-state welfare context.[3]
 
 
 30
 A federal court in this situation is called upon to perform two related functions. First, in wielding equity power, it must weigh competing claims and determine where a preponderance of the equities lies. Second, as an instrumentality of the United States, it must attempt to identify and effectuate the policies of the United States, as formulated by the Congress.
 
 
 31
 With reference to a balancing of the equities, appellees urge such things as the greater relative importance to the recipients of the small individual sums involved as compared with the impact upon the state of the total expenditures which must be made by it in order to carry out the decree. They also say that appellants must have known that their failure to provide the same payments in the two areas was in violation of the federal requirements, and that they were, accordingly, deliberately withholding sums from receipients which the latter were entitled to have. We note in this connection that appellants were state officials who had a responsibility to act in accordance with state legislative directions; and that, even when the legislative command of Section 131-a was altered to permit the Commissioner to raise the levels of payment in the seven-County area, the federal requirements still made differentials justifiable if they were based upon estimates of the respective costs involved. The merits issue determined by the District Court was whether the cost estimates used by the Commissioner adequately sustained his judgment, and that issue was not finally resolved until the District Court's determination on remand became final without appeal.
 
 
 32
 On the balancing issue, appellants argue not only that the administrative costs involved in the carrying out the court's order will be out of proportion to the benefits conferred, but will also impose additional strains upon an administrative mechanism already overburdened by the daily task of coping with the substantial demands of welfare administration. They also point out that retroactive payments will go to persons no longer on the welfare rolls, thereby preventing already inadequate state funds from being channeled to the persons whose needs are immediate and urgent.
 
 
 33
 We are not insensitive to the special incremental value of money to persons living at subsistence levels. At the same time, however, we cannot be sure that the persons from whom funds were withheld in 1969 have a present compelling need for them, or that it is provident, given existing deprivations which might be relieved, to order the expenditure of scarce funds as compensation for past suffering which, however deplorable, cannot be undone.
 
 
 34
 The balancing process cannot, however, be carried out in a vacuum. In this instance its background is federal policy as established in congressional welfare legislation; and it is by reference to that policy that we conclude that the District Court must be reversed.
 
 
 35
 Initially, we note that Congress has not addressed itself explicitly to the question of court-ordered retroactive payments, nor, apparently, has HEW concluded that they are either necessary or forbidden under the federal statutory scheme. See infra at page 240. The issue, then, is what is implicit in the statute, that is to say, would court-ordered retroactive payments on balance assist or hinder the effectuation of federal welfare policies?
 
 
 36
 Court-ordered retroactive payments might be thought to further three congressional interests. First, as the District Court said, such payments might help to deter wilful state violations of federal requirements. As noted earlier, however, we do not think that the record in this case points to bad faith. There is nothing to suggest that the state consistently follows a course of unlawful conduct which requires that it be dramatically confronted by the minatory face of the federal courts.
 
 
 37
 The second federal policy which might arguably be furthered by retroactive payments is the fundamental goal of congressional welfare legislation-the satisfaction of the ascertained needs of impoverished persons. Federal standards are designed to ensure that those needs are equitably met; and there may perhaps be cases in which the prompt payment of funds wrongfully withheld will serve that end. As time goes by, however, retroactive payments become compensatory rather than remedial; the coincidence between previously ascertained and existing needs becomes less clear. That seems to be the case here. In light of the fact that over sixteen months elapsed between the last contested payment and the order of the District Court, we conclude that the federal policy of satisfying the ascertained needs of impoverished persons has little applicability to the facts before us.
 
 
 38
 Thirdly, there is the interest of the federal government as grantor in the proper use of granted funds. While federal courts can of course act to protect the federal fisc, the interest at stake is not personal to welfare recipients; and Congress has given no indication that it deems retroactive payments necessary to protect its interest, since the only remedy it expressly contemplated was a prospective cut-off of funds.
 
 
 39
 Moreover, we cannot ignore the realities of the situation. The funds which were misspent are, as a practical matter, irretrievable. It would be unthinkable to order welfare recipients who received federal money under an illegal state program to return their checks. The reality is that the only means of redressing the harm to the federal treasury is to order the offending state to achieve ex post facto compliance through additional expenditure of its funds.
 
 
 40
 That reality, however, invokes significant countervailing policies, namely, those behind the scheme of cooperative federalism alluded to earlier. Congress was clearly sensitive to the potential for serious strain in the federal structure inherent in a grant program of great magnitude and complexity. It decided that states were, through the incentive of matching grants, to be encouraged to make generous use of their own funds to aid their impoverished citizens. But the states were not to be deprived of their freedom to determine ultimately whether, and how, state funds are to be spent. Absent explicit directions from Congress to the contrary, we do not think that the federal interest in retroactively correcting the misuse of federal funds-the only federal policy applicable to this case-can by itself justify the significant increase in federal-state tensions which would result from a court order requiring the state to expend its funds against its will.
 
 
 41
 We thus conclude that the public interest considerations which cause the state to oppose retroactive payments under the circumstances of this case are to be given special weight, and that a federal court should be very slow indeed to command a result which the state believes not to be the best use of state funds in meeting the current needs of its citizens.
 
 
 42
 We are thus of the opinion that the disposition made in Rosado of the issue of retroactive payments represents the sounder conception of the extent to which a federal equity court should intervene in this public assistance area. We are not impressed with the necessity purported to be felt by the District Court in the case before us to deter the state from deliberate and continuous constitutional and statutory violations in the future. We hold that the award by the District Court of retroactive payments in the circumstances of this record was an improvident exercise of its equity powers when measured by "the principles of equity, comity, and federalism" which, as the Supreme Court has recently said in another federal-state context, "must restrain a federal court . . ." Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (decided June 19, 1972).[4]
 
 III
 
 43
 Wholly apart from what we have found to be an improper exercise of equity jurisdiction by the District Court in ordering retroactive payments, there is a very serious question as to whether such jurisdiction exists at all. The Eleventh Amendment provides that the federal judicial power does not extend to suits against a state;[5] and appellants press strongly upon us the proposition that, insofar as retroactive payments are concerned, this is in truth a suit against the State of New York to which it has never consented. We conclude that this point is well taken.
 
 
 44
 It has, of course, been familiar doctrine ever since Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that the Eleventh Amendment does not prevent a federal court from directing a state official to bring his conduct into conformity with federal law. The injunctive relief given by the District Court against appellants rests upon this doctrine. They have been commanded by the court to terminate a practice which is found to be in conflict with federal statutory law; and the giving of relief of this nature by the federal courts is not thought to be a suit against the state itself. Appellees insist that the court may, without colliding with the Eleventh Amendment, go further and include within its decree a direction that appellants shall restore the sums which, under a course of conduct which they are now enjoined from pursuing, were withheld by them from welfare recipients in the past.
 
 
 45
 It is not pretended that these payments are to come from the personal resources of appellants. Appellees expressly contemplate that they will, rather, involve substantial expenditures from the public funds of the state. It is equally a part of the lore of the Eleventh Amendment that, even though a state may not be named as a party defendant, any judgment declaring a liability which must be met from the public funds of the state does come within the reach of the Eleventh Amendment; and a court will, absent the state's consent, be deemed without jurisdiction to enter such a judgment. Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 463-464, 65 S.Ct. 347, 89 L.Ed. 389 (1945).
 
 
 46
 It is one thing to tell the Commissioner of Social Services that he must comply with the federal standards for the future if the state is to have the benefit of federal funds in the programs he administers.[6] It is quite another thing to order the Commissioner to use state funds to make reparation for the past. The latter would appear to us to fall afoul of the Eleventh Amendment if that basic constitutional provision is to be conceived of as having any present force.[7]
 
 
 47
 We find especially instructive in this regard the opinion in Westberry v. Fisher, 309 F.Supp. 12 (D.Maine 1970). In that case the welfare officials of Maine were sued in a class action under 42 U.S.C. Sec. 1983. A three-judge court held that Maine's maximum limitations on payments to AFDC families violated the Equal Protection Clause; and the officials in question were enjoined from their future enforcement. The case was then remanded to a single judge for determination of the damage claims advanced by the plaintiffs. After first holding that the defendant officials were not liable in their personal capacities, the court addressed itself to the contention that the defendants should be held liable in their representative capacities for the restoration of sums wrongfully withheld in the past. There, as here, the plaintiffs did not deny that such payments would be a liability of the state and would be payable out of the public funds of the state. The court, after a careful examination of relevant authorities, held that the claim as so put forward was "in effect a suit against the State of Maine of which a federal court does not have jurisdiction . . ."[8]
 
 
 48
 The response of appellees to the Eleventh Amendment point is two-fold. First, they insist that 42 U.S.C. Sec. 1983 is intended to provide a comprehensive remedy for the deprivation of constitutional and statutory rights, and that an award of retroactive payments in the public assistance area is no different from the award of back pay to a wrongfully dismissed school teacher as "an integral part of the equitable remedy of injunctive reinstatement." Harkless v. Sweeny Independent School District, 427 F.2d 319, 323-324 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971). Second, they assert that the protection of the Eleventh Amendment can always be waived, Parden v. Terminal Railway of Alabama State Docks Department, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); and that New York has done so by reason of its acceptance of the federal funds available under the Social Security Act for use in state welfare programs.
 
 
 49
 As to the first of these contentions, we note preliminarily that of course Congress cannot by statute nullify the protection which the Constitution in the form of the Eleventh Amendment affords to the states. Section 1983 itself is phrased in terms of the liabilities of persons as distinct from sovereign states, and it seems clear that states are not persons within the meaning of that statute. See Westberry v. Fisher, at p. 18 of 309 F.Supp., and the authorities there cited. The issue in Harkless was whether the Seventh Amendment guarantee of a jury trial was available to the persons sued, and the language in that opinion relied upon by appellees was in the context of a holding that it was not.
 
 
 50
 With respect to the matter of waiver, it is unquestionably true that a state may voluntarily relinquish the shield of the Eleventh Amendment, but, as is always the case in the area of alleged waivers of constitutional rights, that relinquishment must be shown to be clear and unequivocal. Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed.2d 1121 (1944); Knight v. State of New York, 443 F.2d 415, 419 (2nd Cir. 1971). We do not find such a waiver in the mere fact of New York's election to receive federal funds to help defray the cost of the welfare programs which New York has chosen to provide its citizens. Congress has not explicitly conditioned the grant of such funds upon the willingness of the recipient state to waive the immunity from suit provided by the Eleventh Amendment; nor are retroactive payments so necessary to the effectuation of congressional policies that a waiver arises by implication. Compare Parden v. Terminal R. Co., supra. That opinion pointed out, 377 U.S. at 196-198, 84 S.Ct. 1207, 12 L.Ed.2d 233, and this court emphasized in Knight v. State of New York, 443 F.2d at 418, that waiver of immunity under the Eleventh Amendment was more likely to be found when the state had decided to "leavethe sphere that is exclusively its own and [enter] into activities subject to congressional regulation. . . .,"-in that case activities of the sort generally conducted by private persons. See also Employees of Department of Public Health & Welfare v. Department of Public Health & Welfare, 452 F.2d 820, 826-827 (8th Cir. 1971). Here the State of New York in this action has exercised exclusively "governmental" functions, in furtherance of basic federal policies.
 
 
 51
 The doctrine of Ex parte Young has made it possible for suits to be brought in federal courts against state welfare officials without impingement on the Eleventh Amendment, but the available remedies against them do not exceed the scope of Ex parte Young and, in particular, they do not comprehend judgments involving the payment of money which are intended to be-and which can only be-liquidated by the expenditure of state funds. For a very recent holding that mere participation by a state in a federal grant-in-aid program (in this instance, the Federal-Aid Highway Act) does not amount to a waiver of the Eleventh Amendment, see Daye v. Pennsylvania, decided by the U.S. District Court for the Eastern District of Pennsylvania on June 30, 1972, 344 F.Supp. 1337.
 
 
 52
 The District Court, in its memorandum opinion justifying its award of retroactive payments, made no reference to the Eleventh Amendment or to the problem it presents in respect of the exercise of federal jurisdiction. In balancing the equities relevant to the request for retroactive payments, the court did, as noted above (p. 231), refer to a statement made by a lawyer for the Department of Social Services in an affidavit submitted to the three-judge court in opposition to the grant of a preliminary injunction. That statement was that ". . . maintenance of welfare payments at present levels would result in no irreparable harm to plaintiffs since any sums ultimately found to be owing them could be disbursed at that time."
 
 
 53
 In their brief in this court appellees have relied on this statement as negating any abuse of discretion by the District Court in finding that the balance of equities tips towards the remedy of retroactive payments. They have not invoked it as evidencing a waiver by the state of its Eleventh Amendment immunity from suit. We do not, in any event, think that it can be taken as performing that office. This is so initially because it hardly represents an authoritative formulation and declaration of state policy. More significantly, however, it is subject to varying interpretations which prevent it from being the kind of clear and purposeful waiver which the Supreme Court has required in this context. It could, for example, mean that plaintiffs would always be free to seek corrective payments pursuant to the "fair hearing" procedures which New York, in common with other state recipients of federal grants, is required by HEW regulations to provide in order to assure persons aggrieved by denials of their eligibility to receive assistance or by payments less than what they believe themselves to be entitled, to seek administrative relief at the hands of the state. It is clear, as will appear hereinafter, that HEW does not require that retroactive payments invariably be made administratively in the circumstances here involved, but the opportunity to seek them through the "fair hearing" channels is always present. So viewed, the affidavit statement would be relevant to the question of irreparable injury in respect of a preliminary injunction, but it could by no means be considered to be a clear manifestation of consent by the state to be subjected to the judicial power of the United States.
 
 IV
 
 54
 For the most part, appellees have been content to defend the District Court's award of retroactive payments by the assertion that other federal courts have done so and that their judgments on appeal to the Supreme Court have been affirmed. It certainly is true that relief of this kind has been given in other cases. We do not find, however, that the Supreme Court has as yet addressed itself specifically and authoritatively to this issue.
 
 
 55
 We turn first to the two cases cited by the District Court as supporting its award of retroactive payments. In Gaddis v. Wyman, 304 F.Supp. 717 (N.D.N.Y.1969), aff'd sub nom., Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970), a three-judge court held unconstitutional under the Equal Protection Clause a New York statute rendering ineligible for AFDC assistance persons who applied within one year after their arrival in New York for the purpose of receiving such assistance. The opinion of the three-judge court recites the court's purpose to enjoin the defendants from enforcing the state statute but says nothing about the remedy of retroactive payments to persons denied assistance prior to the invalidation of the statute. The Supreme Court's summary affirmance merely cites Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).
 
 
 56
 Shapiro is the other case relied upon by the District Court. A three-judge district court in Connecticut held that a statute of that state imposing length-of-residence requirements on applicants for public assistance violated the Equal Protection Clause. In addition to declaratory and injunctive relief, the three-judge court awarded the plaintiffs "monies unconstitutionally withheld," and in this connection characterized the Eleventh Amendment as no barrier to its award of such damages. 270 F.Supp. at p. 338, note 5. It appeared to believe that, because Ex parte Young permitted suit against a state official who was acting unconstitutionally, the court could order that individual "to tender monies which he unconstitutionally withheld," even though the funds necessary to carry out the judgment would have to come at least in part from the state. On appeal to the Supreme Court, there is no reference of any kind to that matter in the Supreme Court's lengthy affirming opinion.[9]
 
 
 57
 In Swank v. Rodriguez, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971), the Supreme Court summarily affirmed an appeal from a decision of a three-judge district court in Illinois holding invalid a state regulation forbidding assistance payments to new applicants for periods prior to the month in which the application is approved. The relief requested was a declaration that the regulation was in violation of both federal statutory requirements and the Equal Protection Clause, and that the defendant state officials were bound to begin paying benefits within thirty days after application or, if approval is forthcoming only after that period, to pay benefits retroactively to the thirtieth day after application. The court was asked for a declaration that payments retroactive to the relevant application dates are constitutionally required, and for an injunction restraining further enforcement of the Illinois regulation.
 
 
 58
 The judgment of the three-judge court was to deny all defense motions to dismiss or for judgment on the pleadings, and to allow the complaint to proceed as a class action. The court's opinion recites that the defendants contended that the case could not proceed as a class action because the complaint was predominantly one for money damages and therefore not within the language of Rule 23(b)(2), F.R.Civ.P. The court characterized the case as one in which "the primary relief sought by the class is an injunction against state practices which allegedly deny federal rights, rather than recovery of past benefits." With respect to sovereign immunity, the opinion indicates that the only issue of this nature raised was that the Illinois Constitution prevented this suit against the state irrespective of the nature of the relief sought. This contention was disallowed by reference to state cases construing the constitutional provision.
 
 
 59
 In the jurisdictional statement filed in the Supreme Court in Rodriguez, the state officials asserted the district court had abused its discretion in ordering retroactive payments. It was said that the Social Security Act makes no provision for retroactive payments, and that the HEW regulations do not require a state agency to make restitution for payments wrongfully withheld in the past.
 
 
 60
 The Solicitor General was invited to participate as an amicus. In the statement filed by him, he referred to the State's argument that "the provision for back benefits is not appropriate." He noted that the Supreme Court had affirmed some district court decisions making retroactive awards, but "without discussion of the issue appellant raises." His representations to the Court as to the merits of this issue made no reference to the Eleventh Amendment, presumably because petitioners were claiming only an abuse of discretion by the district court. Those representations are set forth below in full:
 
 
 61
 As we recently pointed out in our amicus curiae memorandum in Wyman v. Boddie, No. 1262, this Term, we take no position on the correctness of such relief. If the judgments are affirmed, federal funds will be paid to the State to meet the federal share of the payments which will be due; but the Department of Health, Education and Welfare does not view an order attaching consequences to noncompliance at a date earlier than final judicial action as either necessary or forbidden under the statutory scheme. On the one hand, the State is committed to compliance by its statutes, and if the plaintiffs are correct on the merits they have been deprived of the funds necessary to meet the minimum standard of need. On the other, the direct federal remedy of withholding federal funds from a nonconforming state, 42 U.S.C. (Supp. V) 604, 1384, may be judicially stayed until a final judicial decision has been reached; and no provision is made for a refund by the state of the federal funds which may be paid it during the pendency of the administrative proceedings and subsequent judicial review. 42 U.S.C. (Supp. V) 1316.[4]
 
 
 62
 In an opinion issued October 2, 1970, in Boddie v. Wyman, 323 F.Supp. 1189, the District Court for the Northern District of New York granted a motion for preliminary injunction sought by plaintiff AFDC and AABD recipients in the upstate counties. The court said that it would enjoin the enforcement of Section 131-a because of the differentials between levels of assistance in those counties as compared with New York City. It appears to be true that in the injunctive order entered by the court on October 13, 1970, corrective payments were directed to be made to October 1, 1970.
 
 
 63
 The judgment of the District Court was appealed to this court where it was affirmed. 434 F.2d 1207 (1970). A further appeal to the Supreme Court resulted in summary affirmance. 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971). The panel of this court which affirmed wrote an opinion in which there is no reference to the remedy of "corrective payments," indicating that the appellant state officials in that case did not challenge this feature of the judgment.[10]
 
 
 64
 What all this suggests is that the Supreme Court has not yet come to grips with the problem of retroactive public assistance payments as a remedy which federal courts either can or should order to be made. What is clear is that declaratory and injunctive relief can be granted against state officials which prohibit the continued enforcement of state welfare statutes or regulations which are either unconstitutional or not in keeping with standards deriving from federal statutes. An unconstitutional state practice or plan could not be continued by the state even if it were willing to forego federal financial help, although even in such case the existence of federal jurisdiction to require retroactive payments would be dubious at best-a situation which, of course, we do not have here. Contrarily, state welfare administration which is invalid only in the sense that it does not conform to federal standards may be continued, federal court injunction notwithstanding, if the state is willing to bear its entire cost.
 
 
 65
 In the light of these propositions-which are about the only certainties we discern in this complex and confused area of the law-we believe ourselves, insofar as the Supreme Court is concerned, to be free to assert that, first, we do not consider it an appropriate exercise of federal equity jurisdiction for the District Court to compel New York to devote its funds to retroactive payments, and, second, even if the action taken by the District Court be deemed to be in keeping with the framework of federal-state relationships in the case of grants-in-aid for welfare programs, the Eleventh Amendment stands in the way. It is for New York, and not for the federal courts, to decide what policy is to be followed with respect to retroactive payments in the circumstances of this record.[11]
 
 
 66
 The judgment appealed from is reversed and the case remanded for disposition consistent herewith.
 
 
 
 *
 Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation
 
 
 [1]
 In Dandridge the Court reaffirmed the principle that a state participating in the federally assisted aid programs has great latitude in dispensing its available funds; and it held that a Maryland regulation imposing a ceiling on AFDC monthly payments regardless of the size of the family and its actual need did not violate either the Social Security Act or the Equal Protection Clause of the Fourteenth Amendment
 
 
 [2]
 At this time the payments in New York City and the seven-County area were the same because of the three-judge court injunction in this case, and the subsequent stipulation on remand from the Supreme Court
 
 
 [3]
 Appellees also argue that the "practicalities of the Rosado case made both injunctive and retroactive payments extremely difficult," for the reason that there were assertedly alternative ways available for the state to bring itself into compliance with federal standards, with each such alternative involving a different measure of retroactive payments. Here, so it is said, there was only one alternative, namely, the raising of the level of payments in the seven-County area to that obtaining in New York City; and, therefore, retroactive payments could be easily computed. The force of this argument is not clear to us since the District Court in Rosado appeared to have no question but that the retroactive payments requested could be accurately computed and, indeed, referred in its opinion to the amount of money which appeared to be involved
 
 
 [4]
 In this case the Supreme Court settled the issue of whether 42 U.S.C. Sec. 1983, on which appellees rely, is within the exceptions to 28 U.S.C. Sec. 2283, which generally forbids federal courts from enjoining state court proceedings. Although holding that it is so included, and that federal district courts are not absolutely barred by statute from enjoining state court proceedings under any and all circumstances, all the members of the Court joined in emphasizing that the principles of federalism always and continuously impose restraints upon the actual exercise by the federal courts of such power as they have to interfere with state judicial processes
 
 
 [5]
 The Supreme Court long ago construed the language of the Amendment as comprehending a suit against a state by its own citizens. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). And the fact that the state is not itself named as a defendant does not render inoperative the constitutional limitations upon federal jurisdiction. Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 576-577, 66 S.Ct. 745, 90 L.Ed. 862 (1946); Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 463-464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)
 
 
 [6]
 In its Rosado opinion the Supreme Court said that "[W]hile [King v. Smith] did not advert specifically to the remedial problem, the unarticulated premise was that the State had alternative choices of assuming the additional costs of paying benefits to families with substitute fathers or not using federal funds to pay welfare benefits according to a plan that was inconsistent with federal requirements." 397 U.S. at 420-421, 90 S.Ct. at 1222. Cf. Hergenreter v. Hayden, 295 F.Supp. 251, 256 (D.Kan.1968); Shepheard v. Godwin, 280 F.Supp. 869, 876 (E.D.Va.1968)
 
 
 [7]
 This court has recently had occasion en banc to recognize the barrier interposed by the Eleventh Amendment to a remedial order of the District Court requiring the payment of money damages by the state. Sostre v. McGinnis, 442 F.2d 178, 204-205 (1971), cert. denied, sub nomine, Sostre v. Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972)
 
 
 [8]
 The court also rejected the argument that the adoption by Maine of the so-called "fair hearing" regulations promulgated by HEW provided a basis to award welfare payments. The court observed that the fair hearing regulations represented only an administrative procedure under which a state might award retroactive benefits to a person who had been wrongfully refused welfare payments. They did not, in the court's view, afford a jurisdictional base for a federal court to order that such retroactive payments be made
 
 
 [9]
 The Supreme Court in one opinion disposed not only of Shapiro but of two other appeals from district courts in Pennsylvania and the District of Columbia. Although the jurisdictional statement in Shapiro raised the Eleventh Amendment issue, that question would not, of course, be present in the District of Columbia case. Indeed, it is not clear that the D.C. or Pennsylvania cases involved the award of retroactive payments
 
 
 [4]
 The Department has sought a statutory amendment which would permit it to require retroactive payments to eligible persons denied them by a non-conforming state. H.R. 16311, 91st Cong., 2d Sess. c. 169-170 (Committee Print of Nov. 5, 1970 before the Senate Committee on Finance)
 
 
 [10]
 Internal administrative documents of the Department of Social Services appended to appellees' brief indicate that on June 10, 1971, after the Supreme Court affirmance, instructions were given to proceed with the making of the corrective payments called for in the District Court's judgment. Since the District Court's judgment and its affirmance by this court occurred prior to the submission in this case of the request for retroactive relief, it would appear that either the state through inadvertence failed to object to such relief in Boddie v. Wyman or it had not as yet fixed upon a policy of opposing such relief
 
 
 [11]
 Appellees argue that the mere existence of the "fair hearing" provisions in the New York regulations supports the judgment entered by the District Court. The court itself did not rely in any way on this fact, apparently recognizing that those procedures have no relevance to what constitutes an appropriate exercise of remedial equity jurisdiction by a federal court, except perhaps to undermine the contention that the court must provide a deterrent to future unlawful action committed in the assurance that there will be no untoward financial consequences in the form of reparations payments. We note that in two instances federal courts in Connecticut have in terms remanded the issue of retroactive payments to the state welfare agency for consideration of such complaints as may be filed under the fair hearing regulations. See Doe v. Shapiro, 302 F.Supp. 761, 768 (D.Conn. 1969), appeal dismissed, 396 U.S. 488, 90 S.Ct. 641, 24 L.Ed.2d 677 (1970); Solman v. Shapiro, 300 F.Supp. 409, 416 (D.Conn.), aff'd, 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969)