472 F.2d 985
 John JORDAN, by his next friend, Jeanette Bryant,
Individually and on behalf of all other persons
similarly situated,
Plaintiffs-Appellants, Cross-Appellees,
v.
Edward T. WEAVER et al., Defendants-Appellees, Cross-Appellants.
 Nos. 72-1380, 72-1381.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 20, 1972.
Decided Jan. 18, 1973.
 
 William J. Scott, Atty. Gen., Warren K. Smoot, Donald S. Carnow, Asst. Attys. Gen., Chicago, Ill., for Weaver.
 Sheldon H. Roodman, Marilyn K. Katz, Chicago, Ill., for Jordan.
 Before HASTINGS, Senior Circuit Judge, CUMMINGS, Circuit Judge, and GORDON, District Judge.[1]
 CUMMINGS, Circuit Judge.
 
 
 1
 This class suit was brought to challenge actions of Illinois and Cook County officials in administering the federal-state program of Aid to the Aged, Blind and Disabled ("AABD") under 42 U.S.C. Secs. 1381-1385. Count I of the amended complaint alleged that defendants, acting pursuant to Section 4004.1 of the Categorical Assistance Manual of the Illinois Department of Public Aid,[2] were not complying with federal regulations requiring that eligibility determinations on applications for assistance for the aged and blind under AABD be made within 30 days and for the disabled within 60 days (formerly 45 days) and requiring that those found eligible receive their assistance within the respective maximum time periods.[3] Plaintiffs further charged that defendants improperly authorized grants to commence only with the month in which an application was approved and not including prior eligibility months for which an applicant was entitled to aid under federal law.[4] Count II alleged that the Fourteenth Amendment, the applicable federal and Illinois statutes, and the federal regulations require that AABD applicants who meet the eligibility conditions on the date of application must receive assistance effective from that date.
 
 
 2
 The district court declared Section 4004 (and subsections thereunder) of the Illinois Categorical Assistance Manual invalid insofar as it was at variance with 45 C.F.R. Sec. 206.10(3) and granted a permanent injunction requiring compliance with the federal time limits for processing and paying AABD applicants, except in certain exemplified unusual circumstances, and retroactively requiring defendants to release AABD benefits withheld from those whose applications, commencing on July 1, 1968, to April 16, 1971,[5] had not been processed within the federal time limits. A stay pending appeal was granted as to the latter requirement. The court also held that eligible AABD applicants are not entitled to assistance from the date of application and denied plaintiff's prayer for punitive damages against a former Director of the Illinois Department of Public Aid. Defendants appeal from the district court's decision on the grounds that plaintiff's suit for retroactive welfare benefits may not be maintained in federal court because barred by the Eleventh Amendment, that the judgment of inconsistency between the federal regulations and the provisions of the Illinois Categorical Assistance Manual can be given prospective effect only, and that the federal regulations in question are inconsistent with the Social Security Act. Plaintiffs appeal from that decision insofar as it held them not entitled to receive benefits from the date of their applications and insofar as it failed to award the requested punitive damages.
 
 Eleventh Amendment Defense
 
 3
 Defendants' principal argument is that the Eleventh Amendment or the sovereign immunity doctrine bars an action against the Director of the Illinois Department of Public Aid for retroactive welfare AABD payments. Significantly, defendants do not rely on the Eleventh Amendment or sovereign immunity with respect to the expenditure of state funds resulting from other portions of the judgment below. We conclude the argument must fail.
 
 
 4
 First of all, in four different three-judge court decisions which rejected the identical Eleventh Amendment argument defendants advance here, appeals were taken to the Supreme Court specifically raising the point. The Supreme Court affirmed each case. Sterrett v. Mothers & Childrens Rights Organization, 409 U.S. 809, 93 S.Ct. 68, 34 L.Ed.2d 70 (1972), affirming unreported order and judgment, N.D.Ind. April 14, 1972, on remand from Carpenter v. Sterrett, 405 U.S. 971, 92 S.Ct. 1199, 31 L. Ed.2d 246; State Dep't of Health and Rehabilitative Services v. Zarate, 407 U.S. 918, 92 S.Ct. 2462, 32 L.Ed.2d 803; affirming unreported decision, S.D.Fla. Sept. 29, 1971, January 20, 1972; Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38, affirming Gaddis v. Wyman, 304 F.Supp. 717, order at CCH Pov.L. Rptr. Transfer Binder p 10,506 (S.D.N. Y.1969); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, affirming 270 F.Supp. 331 (D.Conn. 1967).[6] Although two of the affirmances were summary, and the other two at least the equivalent, (in Shapiro the Supreme Court affirmed without commenting on the issue, and Wyman was a per curiam affirmance on the authority of Shapiro), a summary affirmance is a decision on the merits having precedential value. E. g., Cincinnati, New Orleans & Texas Pacific Ry. Co. v. United States, 400 U.S. 932, 935, 91 S.Ct. 235, 27 L.Ed.2d 240 (Justice White dissenting from the summary affirmance); Barton v. Sentner, 353 U.S. 963, 77 S.Ct. 1047, 1 L.Ed.2d 901 (Justices Burton and Clark dissenting from the summary affirmance). See Stern and Gressman, Supreme Court Practice 197 (4th ed. 1969). Therefore, we conclude that the aforementioned Supreme Court affirmances foreclose the sovereign immunity or Eleventh Amendment argument defendants press here.
 
 
 5
 Secondly, even if an independent analysis were open to us, we would hold the defendants' contentions to be without merit. We recognize the Second Circuit came to a contrary conclusion in Rothstein v. Wyman, 467 F.2d 226 (2d Cir. 1972), but are unpersuaded by its reasoning.[7]
 
 The Eleventh Amendment reads as follows:
 
 6
 "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
 
 
 7
 Taken literally, this amendment does not bar suits by Illinois citizens against Illinois or its officials. However, in 1890 the Supreme Court decided that suits against a state by citizens of the same state could likewise not be maintained in federal courts. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842. Whether the holding amounted to a liberal extension of the amendment or a statement of the common law of sovereign immunity is unclear, although the decision was bottomed on the concept of sovereign immunity which found constitutional embodiment in the Eleventh Amendment.[8] For our purposes it is unnecessary to decide whether the asserted defense of immunity from suit is of constitutional stature, although we recognize that a waiver of this immunity may more readily be found if it is not.[9]
 
 
 8
 It is conceded that under the doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, the Eleventh Amendment or sovereign immunity is no bar to a federal court's ordering state welfare officials to bring their conduct into conformity with federal law.[10] Defendants argue, however, and the Second Circuit held, that this doctrine falls short of allowing a federal court to order these officials "to use state funds to make reparation for the past." 467 F.2d at 237. It is said that "It is * * * a part of the lore of the Eleventh Amendment that, even though a state may not be named as a party defendant, any judgment declaring a liability which must be met from the public funds of the state does come within the reach of the Eleventh Amendment * * *." 467 F.2d at 236. But of course the injunctions conceded to be authorized by Ex parte Young, supra, certainly operate as liabilities upon the state treasury. Even before Ex parte Young it was recognized that relief which was appropriate notwithstanding the Eleventh Amendment would to varying degrees act directly on the property of the state. Osborn v. The Bank, 22 U.S. (9 Wheat.) 738, 853. Mandatory injunctions granted on the authority of Ex parte Young have certainly had an impact on the state treasury by requiring the expenditure of public funds. See, e.g., Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534; Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287; Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 112 L.Ed.2d 256; Jackson v. Ogilvie, 426 F. 2d 1333 (7th Cir.), certiorari denied, 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 64 (1970). Here the district court's permanent injunction requiring compliance with the federal time limits for processing and paying AABD applicants reaches into the state treasury and requires the expenditure of more monies than the state was spending under the practices found unlawful. In fact, that part of the judgment requires the expenditure of more monies than the seriously disputed part of the judgment requiring the payment of wrongfully withheld benefits! Whether a liability is declared which must be met from the state's public funds is not the touchstone of the Eleventh Amendment's applicability.
 
 
 9
 It is said in Rothstein that Ex parte Young allows only "prospective" relief and it is apparently assumed that the date of the district court's decision is the crucial one for determining prospectivity. 467 F.2d 236-237. (See note 11, infra.) In Ex parte Young the Minnesota legislature had set allegedly confiscatory railroad rates, and in an effort to make a test of the legality of the rates impracticable made issuance of any ticket above the rate a crime punishable by an enormous fine or lengthy imprisonment or both. This scheme was alleged to violate equal protection and due process. On the eve of the effective date of the legislation, petitioners applied for and received a federal court injunction against the state Attorney General forbidding him to enforce the statute. The Supreme Court held the district court could properly grant the early injunction applied for, notwithstanding the Eleventh Amendment, upon finding the enactment unconstitutional. To be sure, in the posture of Ex parte Young, in the district court, the injunction prayed for was completely adequate equitable relief. The validity of that injunction, which the State Attorney General disobeyed, was the issue before the Supreme Court. There is nothing in Ex parte Young which delimits the relief a district court can give notwithstanding the Eleventh Amendment in a case which comes before it in a different posture. In fact, it appears that the Court in Ex parte Young was well aware that permissible relief might take a form other than a prospective injunction, for it phrased the question before it generally as "whether there is a remedy that the parties interested may resort to, by going into a Federal court of equity, in a case involving a violation of the Federal Constitution * * *." 209 U.S. at 149, 28 S.Ct. at 449. Even before Ex parte Young, in Osborn v. The Bank, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204, the Court decreed return of monies collected pursuant to an unconstitutional Ohio tax on a federally chartered bank and did not draw any distinction between a preventive injunction and a decree of restitution "if the act be performed". Id. at 838, 849. The Court in Young did not doubt this proposition. 209 U.S. at 167, 28 S.Ct. 441. We think the teaching of Ex parte Young is not that a prospective injunction only may issue, but that, where appropriate to deal with defiance of federal law, a federal court's equitable intervention may take an effective form.
 
 
 10
 This conclusion is buttressed by the Supreme Court's unanimous holding in Department of Employment v. United States, 385 U.S. 355, 87 S.Ct. 464, 17 L. Ed.2d 414. There Colorado imposed an unemployment compensation tax on employees of the American National Red Cross. Deciding that the Red Cross as a federal instrumentality was immune from such taxation, the three-judge court enjoined enforcement of the tax statute against the Red Cross and ordered a refund of taxes already paid. Faced with an Eleventh Amendment defense, the Supreme Court upheld the district court's judgment in all respects. The Court did not differentiate between the equitable reliefs and, citing Ex parte Young as well as Monaco v. Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282, gave no indication that the doctrine of Ex parte Young did not embrace the refund of taxes wrongfully exacted or that the refund order was possible only because of plaintiff's status as the United States. 385 U.S. at 358, 87 S.Ct. 464.
 
 
 11
 As in Department of Employment v. United States, supra, if the only relief that could be granted under the Eleventh Amendment here were an injunction against the continuation of illegal conduct after the date of the decree, the force of federal law could be seriously blunted. The state welfare officials could withhold benefits in violation of federal law until suit is brought and a court acts, and retain the illegal savings acquired theretofore. The price would be paid by the beneficiaries of a federal program in which the state, not incidentally, agreed to participate and whose regulations it therefore agreed to abide by. 42 U.S.C. Secs. 1302, 1381 et seq. An eligible beneficiary who brought suit contemporaneously with the initiation of the welfare officials' illegal practices and eo instante secured an injunction could obtain all the benefits he was entitled to, but he would forfeit part of those benefits to the unjust enrichment of the state because he did not instantly file a complaint or because federal judicial machinery consumes time.[11]
 
 
 12
 Defendants rely most heavily on Kennecott Copper Corp. v. State Tax Comm'n., 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862; Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389; and Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121, for the proposition that no decree ordering the payment of state monies can surmount the bar of the Eleventh Amendment. But those cases involved non-resident suits under state-created causes of action for a refund of state taxes allegedly assessed in violation of the Constitution. They reflect the special considerations that dictate noninterference by the federal judiciary in the enforcement of state tax laws where there is an express remedial procedure provided in state courts.[12] Cf. Lynch v. Household Finance Corp., 405 U.S. 538, 542 n. 6, 92 S.Ct. 1113, 31 L.Ed.2d 424; Perez v. Ledesma, 401 U.S. 82, 126-127, 91 S.Ct. 674, 27 L.Ed.2d 701 (concurring opinion of Justice Brennan). We cannot accept them as enunciating the broad proposition that defendants seek to derive from them.
 
 
 13
 It is said that the Supreme Court has not extended the doctrine of Ex parte Young to permit the recovery of monetary "damages" against a state. It is true that the Eleventh Amendment has been held a bar to suits for damages to compensate for personal injuries or property damage under federal statute or law. E. g., Parden v. Terminal R.Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (suit for damages for personal injuries under FELA); Ex parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (admiralty suit for property damage due to negligence). But such cases only exemplify the firmly rooted tradition that consent is required to impress treasury liability for a tort, a sensitive area because liability is imprecise in amount and may work great fiscal disruption on the state. See Jaffe, Suits Against Governments and Officers; Sovereign Immunity, 77 Harv.L.Rev. 1, 29 (1963).
 
 
 14
 Defendants would characterize the relief awarded here as "damages" and thus seek to bring the district court's judgment within the purview of this doctrine. However, we think the remedy afforded here was that of restitution, which "differs greatly from the damages and penalties which may be awarded." Porter v. Warner Holding Co., 328 U.S. 395, 402, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332. Plaintiffs here did not seek relief for consequential damages caused by defendant's failure to disburse their full statutory entitlement.[13] Rather, incident to the injunctive relief prayed for, they asked that exactly measured benefits retained by defendants which would have been paid out but for a violation of federal law be paid over to them. Since the State of Illinois obligated itself to follow federal law in disbursing welfare assistance, it cannot cogently complain that having to make those payments now, which federal law required it to make in the first place, will wreak fiscal disruption. In accepting the federal assistance program, the state must have calculated the cost of compliance. To the extent a decree of retroactive payments would actually disturb the state's finances and cause other programs to suffer, as a matter of equitable balancing of interests, it might well be inappropriate relief.[14] But that possibility is insufficient to preclude the ability of a federal court to order restitution.
 
 As this Court recently made clear:
 
 15
 "Restitution is clearly an equitable remedy. As Professor Moore put it:
 
 
 16
 'In equity, restitution is usually thought of as a remedy by which defendant is made to disgorge illgotten gains or to restore the status quo, or to accomplish both objectives.'
 
 
 17
 The retention of 'wages' which would have been paid but for the statutory violation * * * might well be considered 'ill-gotten gains'; ultimate payment restores the situation to that which would have existed had the statute not been violated." Rogers v. Loether, 467 F.2d 1110, 1121 (7th Cir.1972).
 
 
 18
 Here defendants, acting under color of state law, denied eligible welfare applicants timely assistance benefits to which they were entitled by federal law. In order effectively to redress the deprivation of federal rights, the district court ordered equitable restitution of the benefits wrongfully denied. As Justice Brennan stated, concurring in Perez v. Ledesma, 401 U.S. 82, 106, 91 S.Ct. 674, 687, 27 L.Ed.2d 701 "* * * [T]he basic principle that in appropriate circumstances federal courts will exercise their equity power against state officials to protect rights secured and activities authorized by paramount federal law remains firmly embedded in our jurisprudence." We think that this basic principle embraces both the injunctive and the incidental restitutionary relief awarded in this case.
 
 
 19
 Thirdly, even assuming the Eleventh Amendment or sovereign immunity doctrine stood in the way of plaintiffs' suit to recover welfare benefits wrongfully withheld, Illinois has constructively consented to such an action.
 
 
 20
 No one contests the power of Congress to condition the grant of federal welfare funds to the states on their compliance with the provisions of the federal statutes and regulations relating to the states' use of these funds in their assistance programs. And no one contests the power of Congress to condition the grant of these federal monies on the states' amenability to federal court suit by the beneficiaries of these programs to recover benefits wrongfully withheld because the states failed to comply with federal law. The questions are whether Congress intended to impose the latter condition and whether the states may fairly be said to have consented to such suits by choosing to participate in the AABD program and receive federal funds thereunder.
 
 
 21
 In Rosado v. Wyman, 397 U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442, the Supreme Court decided that "the avenue of effective judicial review [of the compatibility of a state's welfare program with federal law was open] to those individuals most directly affected by the administration of its program." (Emphasis supplied.) Although the statutes establishing the federal assistance program do not create a cause of action for these individuals, 42 U.S.C. Sec. 1983 supplies the cause of action against state welfare officials and its jurisdictional counterpart, 28 U.S.C. Sec. 1343(3) vests the district courts with jurisdiction to grant redress. See Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424. It is inferable from the purpose of Congressional enactment of the AABD program that effective judicial review might include the remedy of restoration of benefits withheld in violation of federal law.[15] Otherwise a state could engage in practices which would deny eligible recipients the full measure of that assistance which Congress has intended for them "at the minimal risk of a subsequent finding of unconstitutionality [or illegality] (if indeed it is challenged) which finding would come only some time later after the case had gone the judicial route and which would deny retroactive relief thus giving the state the desired effect and savings at least during the period of [their] existence." Alexander v. Weaver, 345 F.Supp. 666, 673 (N.D.Ill.1973); see also Alvarado v. Schmidt, 317 F.Supp. 1027, 1042 (W.D. Wis.1970). Certainly we are not to be understood as meaning that retrospective relief is alway or even generally an appropriate remedy.[16] However, the spectre of a state, perhaps calculatingly, defying federal law and thereby depriving welfare recipients of the financial assistance Congress thought it was giving them convinces us that Congress fully meant to condition the grant of federal funds on the states' being susceptible to a federal court suit to obtain retrospective relief. Simply put, we think it unreasonable to presume that Congress would have intended assistance to be given to welfare recipients in conformity with federal law and at the same time deny them the possibility of gaining an effective remedy. See Employees of Dept. of Public Health & Welfare v. Department of Public Health & Welfare, 452 F.2d 820, 831 (8th Cir. 1971) (dissenting opinion), certiorari granted, 405 U.S. 1016, 92 S.Ct. 1294, 31 L.Ed.2d 478.
 
 
 22
 By participating in the federal AABD plan, thereby agreeing to comply with federal statutes and regulations, and by receiving federal funds thereunder, Illinois surely left "the sphere that is exclusively its own and enter[ed] into activities subject to congressional regulation * * *." Parden v. Terminal R. Co., 377 U.S. 184, 196, 84 S.Ct. 1207, 1215, 12 L.Ed.2d 233. "Where a State's consent to suit is alleged to arise from an act not wholly within its own sphere * * * subject to the constitutional power of the Federal Government, the question whether the State's act constitutes the alleged consent is one of federal law." Id.; Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 281-282, 79 S.Ct. 785, 3 L.Ed.2d 804. We cannot conceive that Illinois could legitimately expect to be able to participate in the federal program, receive federal funds in consideration for its agreement to channel them, together with state funds, to beneficiaries in compliance with federal law, and then be able to violate that law and invariably retain the savings accruing through that illegality. Thus as a matter of federal law Illinois has constructively consented to this suit. See Parden v. Terminal R. Co., supra; Briggs v. Sagers, 424 F.2d 130 (10th Cir.), certiorari denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970); see also the opinion of the four dissenting judges in Employees of Dept. of Public Health & Welfare v. Department of Public Health & Welfare, supra.
 
 
 23
 Prospective Application of District Court's Judgment
 
 
 24
 Defendants assert that under Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296, the judgment below must be accorded only prospective effect. This ground was not presented to the district judge before the entry of judgment, so that it comes too late. Even if the ground had been timely presented, defendants' contention would be meritless.
 
 
 25
 In the Chevron Oil case, the plaintiff was injured while working on defendant's drilling rig located on the Outer Continental Shelf off the Gulf Coast of Louisiana, and three years after the date of his injury brought suit in federal court under the "Lands Act" (43 U.S.C. Sec. 1331 et seq.). At the time the lawsuit was filed, firm precedent interpreted the Act to make general admiralty law, including the equitable doctrine of laches, applicable, but more than a year later, yet before trial, the Supreme Court decided Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835. 23 L.Ed.2d 360 holding state law and not admiralty doctrines should be applied under the Lands Act. Thus Louisiana's one-year statute of limitations for personal injury actions rather than the equitable doctrine of laches would be the applicable law, but the Supreme Court declined to apply the Rodrigue decision retroactively to time-bar plaintiff's suit. In so doing the Court generally adopted a three-pronged test for determining the retroactivity question. The first prong is that "the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied * * * or by deciding an issue of first impression whose resolution was not clearly foreshadowed * * *." 404 U.S. at 106, 92 S.Ct. at 355 (emphasis supplied). Only if that test is satisfied, do we reach the second and third prongs of determining "whether retrospective operation will further or retard [the new rule's] operation" and "weigh[ing] the inequity imposed by retroactive application." Id. at 107, 92 S.Ct. at 355.
 
 
 26
 Here defendants cannot satisfy the first test. No new principle of substantive law was enunciated by the district judge. The federal time requirements for processing applications and paying eligible AABD applicants were made effective July 1, 1968, and defendants were well aware of these mandatory maximum permissible time standards. The district court merely found defendants to be noncompliant from and after the effective date of the regulations. Insofar as the defendants might suggest that the relief awarded-payment of wrongfully withheld benefits-was a new principle of law, it should suffice to say that defendants have not shown any reliance on the absence of such a remedy, much less a legitimate reliance interest worthy of protection.
 
 Validity of Federal Regulations
 
 27
 In pertinent part, the Social Security Act provides:
 
 
 28
 "A State plan for aid to the aged, blind, or disabled, or for aid to the aged, blind, or disabled and medical assistance for the aged, must-
 
 
 29
 ******
 
 
 30
 * * *
 
 
 31
 "(8) provide that all individuals wishing to make application for aid or assistance under the plan shall have opportunity to do so, and that such aid or assistance shall be furnished with reasonable promptness to all eligible individuals;" 42 U.S.C. Sec. 1382(a)(8).
 
 
 32
 The Department of Health, Education & Welfare ("HEW") regulations thereunder require that decisions be made promptly on applications within 30 days for the aged and blind and 60 days for the disabled and initiation of payments to the eligible must concededly be made within the same time limits.[17] Defendants contend that these time limitations in the regulations are inconsistent with the parent statute and are therefore an unlawful abuse of rule-making authority.[18] On the contrary, these time requirements, binding on state welfare officials, are an appropriate interpretation of the Congressional mandate of "reasonable promptness." Like v. Carter, 448 F.2d 798, 802-805 (8th Cir. 1971), certiorari denied, 405 U.S. 1045, 92 S.Ct. 1308, 31 L.Ed.2d 558; Rodriguez v. Swank, 318 F.Supp. 289, 295-296 (N.D.Ill.1971), affirmed, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677.
 
 Effective Date for Assistance
 
 33
 Plaintiffs contend that AABD benefits must be paid effective from the date that an individual applies for aid if he is subsequently determined eligible and meets all of the eligibility conditions at the time of his application.[19] Plaintiffs argue that this result is compelled by federal regulations, the Equal Protection Clause of the Fourteenth Amendment, and the Illinois Public Aid Code. The district court rejected plaintiffs' arguments and held that defendants must make their determinations of eligibility and mail the first assistance check (or notice of denial of assistance) within 30 days from the date of application with respect to the aged and blind, and within 60 days of the date of application with respect to the disabled,[20] but that assistance was not required to be retroactive to the date of application.
 
 
 34
 Plaintiffs rely on certain general portions of the HEW's regulations providing that "a state plan * * * shall be in operation through a system of local offices on a statewide basis in accordance with equitable standards for assistance and administration * * *" (45 C.F.R. Sec. 205.120(a)); that "funds will be apportioned among the political subdivisions of the State on a basis consistent with equitable treatment of individuals in similar circumstances throughout the State" (45 C.F. R. Sec. 205.130(2)); that "the eligibility conditions imposed * * * must not result in inequitable treatment of individuals or groups * * *" (45 C.F. R. Sec. 233.10(a)(ii)); and that "the determination of need and amount of assistance for all applicants will be made on an objective and equitable basis * * *" (45 C.F.R. Sec. 233.20(a)(1)). None of these general provisions compels the conclusion that "equitable treatment" is synonymous with assistance paid retroactively to the date of application for those subsequently determined eligible. On the contrary, 45 C.F.R. Sec. 206.10(a)(6) explicitly addresses the effective date of assistance and provides: "Entitlement will begin as specified in the State plan, which (i) for financial assistance must be no later than the date of authorization of payment * * *" (emphasis supplied).[21] And 45 C.F.R. Sec. 206.10(a)(3) provides that the decision to authorize must be made within the applicable 30- or 60-day limitation period. Thus insofar as the general provisions for equitable treatment apply, the pointed provisions of 45 C.F.R. Sec. 206.10 (a)(6) and (3) set the parameters for equitable treatment in the specific situation as to when entitlement to financial assistance shall begin. The result plaintiffs seek is therefore not prescribed by federal regulations.
 
 
 35
 Plaintiffs' constitutional argument is that when entitlement to assistance attaches on the date the applicant is determined eligible, applicants will receive differing initial assistance amounts depending upon the speed of the administrative process. These differences are said to be arbitrary and irrational.
 
 
 36
 Although plaintiffs bitterly criticize as without social justification any policy not to pay for any period prior to the date on which eligibility is determined, it is clear that it is not our task to "decide today that the [state law] is wise, that it best fulfills the relevant social and economic objectives that [the State] might ideally espouse, or that a more just and humane system could not be devised." Jefferson v. Hackney, 406 U.S. 535, 551, 92 S.Ct. 1724, 1734, 32 L.Ed.2d 285, quoting from Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491. There is nothing in the Constitution or the federal law which requires a state to spend more money on welfare by making assistance effective retroactive to the date of application.
 
 
 37
 With respect to the differentials in initial assistance grants due to variance in the speed of the administrative process, plaintiffs point to the gross disparities that formerly existed in paying AABD when the defendants were not complying (indeed were in egregious violation) of the federal maximum permissible time standards. But under the judgment below, these gross disparities have been rectified. All eligible aged and blind must now be paid within 30 days of their applications and all eligible disabled within 60 days therefrom. We have no showing that significant disparities within the time limits will exist when defendants are processing all applications and paying all eligible beneficiaries within the 30- and 60-day time limits. The slight disparities that are likely to occur within these limitations do not suffice to force the state to pay all applicants from the date of their applications.[22] More precise mathematical niceties in the administrative process are not compelled by the Equal Protection Clause (cf. Dandridge v. Williams, supra; Jefferson v. Hackney, supra), and therefore we approve the district court's holding that there is no constitutional requirement that welfare assistance be paid retroactively to the date of application.[23]
 
 
 38
 Finally, plaintiffs contend that the Illinois Public Aid Code, Ill.Rev.Stat.1971, ch. 23, Sec. 3-1, requires that benefits be paid retroactive to the date of application. That statute provides:
 
 
 39
 "Financial aid in meeting basic maintenance requirements for a livelihood compatible with health and wellbeing shall be given under this Article to or in behalf of aged, blind, or disabled persons who meet the eligibility conditions of Sections 3-1.1 through 3-1.6."
 
 
 40
 The Circuit Court of Cook County upheld such an interpretation of the Illinois Act in People ex rel. Naughton v. Illinois Dept. of Public Aid, No. 70 L. 11380 (1971), pending on appeal to the Appellate Court of Illinois.[24] Nevertheless, we find the statute far from clear on this question. We think it especially appropriate to leave interpretation of this opaque statute to the Illinois courts, since the scheme of cooperative federalism created by the matching-grant program already has inherent strains and "it is not the business of the federal courts needlessly to exacerbate those problems." Rothstein v. Wyman, 467 F.2d 226, 232 (2d Cir. 1972). Consequently we restrict our holding to a decision that benefits paid retroactively to the date of application is required neither by federal regulations nor the Constitution.[25]
 
 Award of Punitive Damages
 
 41
 Plaintiffs sought $100,000 punitive damages from defendant Harold O. Swank, former Director of the Illinois Department of Public Aid. In refusing to grant such damages, the district court held that the permanent injunction was a sufficient deterrent to future violations. As in Westberry v. Fisher, 309 F.Supp. 12, 17 (D.Me.1970), the record is utterly devoid of any proof of abuse of discretionary authority, malice, or ill-will on the part of defendant Swank. In our view, the district judge did not abuse his discretion in denying punitive damages. See Francis v. Davidson, 340 F.Supp. 351, 369-370 (D. Md.1972). It is true that the district court granted plaintiff's motion for an order that facts be taken as established, which included statements that Swank knew that eligible AABD applicants were not treated consistently and were not paid within the federal time limitations. Nevertheless, absent any further proof, as the district judge obviously recognized, the granting of that motion does not warrant such a harsh remedy.
 
 
 42
 For the foregoing reasons, the judgment of the district court is affirmed and the stay with respect to paragraph 5 of the judgment below is dissolved.
 
 
 
 [1]
 District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation
 
 
 [2]
 That Section provides in pertinent part:
 "Except for DA and MA-NG(D) cases which have a time standard of 45 days, the time standard for disposition of applications is 30 days from the date the applicants are determined eligible and the effective date of their first assistance or are determined ineligible and receive a notice of denial of assistance * * *." (Emphasis supplied.)
 
 
 [3]
 See 45 C.F.R. Sec. 206.10(3), which provides in pertinent part:
 "A decision will be made promptly on applications, pursuant to reasonable State-established time standards not in excess of 30 days for OAA, AFDC, and AB (and in AABD and MA as to the aged and blind) and 60 days in APTD (and in AABD and MA as to the disabled). Under this requirement the applicant is informed of the agency's time standard in acting on applications, which covers the time from date of application to the date that the assistance check, or notification of denial of assistance or change of award, or the eligibility decision with respect to medical assistance, is mailed to the applicant or recipient." (Emphasis supplied.)
 and 45 C.F.R. Sec. 206.10(6), which provides, inter alia:
 "Entitlement will begin as specified in the State plan, which (i) for financial assistance must be no later than the date of authorization of payment * * *."
 The longer time period for the disabled is to permit a medical determination of their disability.
 
 
 [4]
 42 U.S.C. Sec. 1382(a)(8); 45 C.F.R. Sec. 206.10(3) and (6)
 At all times pertinent to this case, Section 8255.1 of the Categorical Assistance Manual of the Illinois Department of Public Aid provided that a new assistance grant may be authorized for the month in which the application was approved but not (with certain exceptions) for any prior period. Thus where eligibility was determined subsequent to the 30-day and 60-day time periods mandated by federal regulations, an applicant might not receive assistance retroactive to the 30th or 60th day. Such was the case of the named plaintiff who applied for disability assistance on September 18, 1970, but who received aid starting only with the month of January since that was the month in which his application was approved. See Rodriguez v. Swank, 318 F.Supp. 289, 292-293 (N.D.Ill.1970), affirmed, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677. A new Illinois Department of Public Aid regulation, Section 8111 of the Categorical Assistance Manual, provides that when a determination of eligibility is not made within the 30-day or 60-day periods "assistance is to be retroactive to the 30th or 60th day from the date of application, providing the applicant was eligible for that period." However, whereas Section 8255.1 made assistance effective from the first of the month in which eligibility was determined, Section 8111 provides "[T]he period for which needs may be met by initial authorization begins with the date of decision and authorization action by the caseworker." Hence in a case in which the caseworker acts within the appropriate deadline, Section 8111 may defer the effective date of initial assistance beyond what Section 8255.1 would have provided. But see 45 C.F.R. Sec. 206.10(6).
 
 
 [5]
 July 1, 1968, is the effective date of the federal regulations prescribing maximum permissible time standards for processing AABD applications, and April 16, 1971, is the date of the preliminary injunction herein. Under the judgment below, benefits were to be released retroactive to the appropriate time limits
 
 
 [6]
 In Rothstein v. Wyman, 467 F.2d 226 (2d Cir. 1972), the Second Circuit did not have before it the Supreme Court's summary affirmances in Sterrett v. Mothers & Childrens Rights Organizations, supra, and State Dep't of Health and Rehabilitative Services v. Zarate, supra. The former decision came down after the September 7, 1972, decision of the Second Circuit in Rothstein; although the latter had already been rendered, it apparently escaped the Second Circuit's attention. The Second Circuit dismissed the Wyman v. Bowens, supra, affirmance on the ground that the district court's opinion, reported at 304 F.Supp. 717, "recites the court's purpose to enjoin the defendants from enforcing the state statute but says nothing about the remedy of retroactive payments to persons denied assistance prior to the invalidation of the statute." 467 F.2d at 239. However, the order entered following the opinion grants exactly such a remedy, CCH Pov.L.Rptr., Transfer Binder p 10,506 at 11,402-11,403 (October 10, 1969), and the jurisdictional statement in the Supreme Court raised the issue of the propriety of such relief and argued such relief "was an incursion on the Eleventh Amendment." p. 18. With respect to Shapiro, supra, the Second Circuit acknowledged that the jurisdictional statement in that case raised the Eleventh Amendment issue, but somehow thought that the Supreme Court's affirmance of the district court's judgment awarding the plaintiffs monies unconstitutionally withheld was meaningless because the Supreme Court did not comment on the issue and because two other district court decisions disposed of in the same opinion did not involve that issue. 467 F.2d at 239, 239-240 n. 9. We are of the opinion that the Shapiro decision must be considered at least the equivalent of a summary affirmance of the district court's decision on the Eleventh Amendment point. See 270 F.Supp. at 338, n. 5
 
 
 [7]
 Defendants also rely on Westberry v. Fisher, 309 F.Supp. 12 (D.Me.1970) and Francis v. Davidson, 340 F.Supp. 351 (D.Md.1972), which adopts the holding in Westberry
 
 
 [8]
 See generally Note, Private Suits Against States in the Federal Courts, 33 U.Chi. L.Rev. 331 (1966). Compare Ex parte Young, 209 U.S. 123, 150, 28 S.Ct. 441, 52 L.Ed. 714; Chandler v. Dix, 194 U.S. 590, 591, 24 S.Ct. 766, 48 L.Ed. 1129; Ford Motor Co. v. Department of Treasury of Ind., 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389; United States v. Mississippi, 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717; with Ex parte New York, 256 U.S. 490, 497, 41 S.Ct. 588, 65 L.Ed. 1057; Parden v. Terminal R. Co., 377 U.S. 184, 186, 192, 84 S.Ct. 1207, 12 L.Ed.2d 233
 
 
 [9]
 See Note, supra note 8
 
 
 [10]
 In Ex parte Young, 209 U.S. 123, 159, 28 S.Ct. 441, 454, 52 L.Ed. 714 the Supreme Court surmounted the Eleventh Amendment objection by resorting to the fiction that when a state official seeks to enforce state law which conflicts with paramount federal law, "he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." See Davis, Suing the Government by Falsely Pretending to Sue an Officer, 29 U.Chi.L.Rev. 435, 437 (1968). Of course, there is nothing inherent in this fiction which precludes its utilization to allow equitable relief other than an injunction against future conduct. The state official can be said to be "stripped of his official or representative character" when ordered to pay out benefits he withheld in violation of federal law
 
 
 [11]
 There is no suggestion here that the plaintiffs have been dilatory in filing suit. However, this consideration goes to plaintiffs' equitable entitlement to the amounts requested, not to the court's power to grant relief
 How far back the retroactive award should reach will depend on the circumstances of each case. Here, the federal regulations were promulgated well in advance of their July 1, 1968, effective date and defendants knew that compliance was required as of that date.
 
 
 [12]
 In addressing the issue of Utah's consent to federal court suit, Justice Reed may have stated the true ratio decidendi of the immunity question in the three cases:
 "Those cases declare the rule that clear declaration of a state's consent to suit against itself in the federal court on fiscal claims is required. The reason underlying the rule, which is discussed at length in the Read and Ford cases, is the right of a state to reserve for its courts the primary consideration and decision of its own tax litigation because of the direct impact of such litigation upon its finances." Kennecott Copper Corp. v. Tax Comm'n., 327 U.S. 573, 577, 66 S.Ct. 745, 747, 90 L.Ed. 862.
 In none of these cases was the doctrine of Ex parte Young mentioned.
 
 
 [13]
 Compare Westberry v. Fisher, 309 F. Supp. 12 (D.Me.1970), where the plaintiffs requested both wrongfully withheld benefits and consequential damages for pecuniary and other losses sustained as a result of the challenged regulations. The court did not differentiate between the claims for relief, characterizing the prayer generally as for "damages."
 
 
 [14]
 In determining whether to order the retroactive payment of benefits, district courts are exercising their equity powers and hence must engage in a balancing process. They should give consideration to the factors to be weighed in the balance identified by the Second Circuit in Rothstein v. Wyman, 467 F.2d 226, 232-236 (2d Cir. 1972)
 In this case, the defendants did not pointedly bring out below countervailing considerations that might make the district court's relief an improper exercise of equitable discretion. Notably, in appealing the award of retroactive payments in Rodriguez v. Swank, 318 F. Supp. 289 (N.D.Ill.1970) (order Oct. 29, 1970), affirmed, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677, the defendants argued unsuccessfully to the Supreme Court that in ordering retroactive payments (in that case by agreement to the date the lawsuit was filed), the district court clearly abused its discretion. (Jurisdictional Statement at 12.) That case involved defendants' violation of the same federal time regulations as in this case, but with respect to AFDC applicants. Furthermore, the district court here found that defendants "knew that substantial numbers of eligible AABD applicants were being deprived, contrary to the requirements of federal law, of their full AABD entitlements effective thirty days from the date of their application * * *." Since defendants did not thoroughly argue the equities below and do not really press the point here, we will not review the appropriateness of the award of retroactive relief. However, we note that in addition to the deterrent policies that might possibly be served by such an award on the facts of this case, this is not a case involving irretrievably misspent funds but one involving funds which were wrongfully not spent at all. Cf. Rothstein v. Wyman, supra.
 
 
 [15]
 The federal regulations governing the federal welfare programs contemplate court-ordered, retroactive welfare payments by expressly providing for federal financial participation in such corrective payments. 45 C.F.R. Sec. 205.10(b)(2)(3)
 
 
 [16]
 See note 14, supra
 
 
 [17]
 See note 3, supra
 
 
 [18]
 Rule-making authority is conferred by 42 U.S.C. Sec. 1302, which provides:
 "The Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health, Education, and Welfare, respectively, shall make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which each is charged under this chapter."
 
 
 [19]
 See note 23, infra
 
 
 [20]
 The judgment incorporated the "unusual circumstances" exception in 45 C.F.R. Sec. 206.10(a)(3)
 
 
 [21]
 The Secretary of HEW seems specifically to have rejected a requirement that entitlement to financial assistance should attach on the date of application since 45 C.F.R. Sec. 206.10(a)(6)(ii) goes on to say, in contradistinction to entitlement for financial assistance beginning "no later than the date of authorization of payment," that entitlement "for medical assistance must be no later than the date of application * * *." (Emphasis supplied.)
 
 
 [22]
 Assuming arguendo that any differentials due to the speed of the administrative process were unjustified, still no requirement that all applicants be paid retroactively to the date of their applications would be constitutionally necessary since defendants could presumably pass constitutional muster with an administrative procedure that dealt exactly uniformly with all applicants, though not paying them from the date of their applications, even though it resulted in less welfare spending and in some receiving initial payments in lesser amounts than under the present administrative scheme
 
 
 [23]
 Although defendants have not advanced the argument, neither have plaintiffs drawn our attention to any requirement that defendants assume a possibly greater administrative burden of determining eligibility retrospectively as of date of application. It may be that in most cases a determination of eligibility will mean that the applicant was eligible on the date he applied, but plaintiffs imply that the two may not be coincident
 
 
 [24]
 Plaintiffs assert that defendants did not appeal this phase of the nisi prius state court's ruling. The appeal has not yet been argued
 
 
 [25]
 We realize that Class v. White, (D. Conn.1972), is to the contrary, but there even HEW, as amicus curiae, agreed that defendant's classifications for the effective date of assistance were not invalid