**Rosa OWENS and Willie Belle Worth, Individually, and on behalf of all others similarly situated, Plaintiffs,**

v.

**Emmett S. ROBERTS, Secretary, Department of Health and Rehabilitative Services, State of Florida, Defendant.**

No. 73-423-Civ-J-S.

United States District Court,
M. D. Florida,
Jacksonville Division.

Feb. 28, 1974.
On Motion to Amend Judgment
July 17, 1974.

Paul C. Doyle, Steven M. Goldstein, David A. Hertz, Carolyn S. Zisser, Duval County Legal Aid Assn., Jacksonville, Fla., for plaintiffs.

Chester G. Senf, Robert J. Horne, Duane N. Ivester, Jacksonville, Fla., for defendant Secretary.

Glen Smith, Asst. Atty. Gen., Tallahassee, Fla., for defendant State.

Before SIMPSON, Circuit Judge, and YOUNG and SCOTT, District Judges.

## OPINION

CHARLES R. SCOTT, District Judge:

The named plaintiffs, welfare recipients, seek, on behalf of themselves and all those similarly situated, declaratory and injunctive relief against the Secretary, Florida Department of Health and Rehabilitative Services,[1] the principal welfare officer for the State of Florida, on the grounds that Fla.Stat. § 409.-185(1)(b)[2], F.S.A. and Florida Division of Family Services Regulation, Ch. V, § II[3], relating to the transfer of assets as an exclusion from eligibility, violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. In addition, they contend that the aforesaid statute and administrative regulation are inconsistent with the Social Security Act, 42 U.S.C. § 301 et seq., and are, therefore, invalid under the Supremacy Clause.

---

1. When this action was initially instituted on May 31, 1973, Emmett S. Roberts was then Secretary of the Florida Department of Health and Rehabilitative Services (HRS). Subsequent to that date, he resigned and Oliver J. Keller was appointed in his place effective September 1, 1973. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Keller, as Mr. Roberts' official successor, is automatically substituted as a party defendant. In addition, on December 11, 1973, with the consent of all parties, the State of Florida was allowed to intervene as a party defendant. Notice of final hearing before the three-judge panel was given to the State of Florida in accordance with 28 U.S.C. § 2284.

2. Fla.Stat. § 409.185(1)(b), F.S.A. provides as follows:

> (1) The department, through the division, shall provide financial assistance to needy persons who:
>
> . . . . .
>
> (b) Have not made an assignment or transfer of property for the purpose of rendering or keeping himself eligible for assistance under this chapter. Any such assignment or transfer of property

prior to the receipt of assistance or during the receipt of assistance pursuant to the provisions of this chapter shall constitute a rebuttable presumption that such assignment or transfer of property was made for the purpose of rendering or keeping the applicant eligible for assistance under this chapter.

3. DFS Regulation, Ch. V, § II, provides as follows:

> The transfer of an asset by the individual(s), child, parent or relative will make him ineligible for two years from the date of transfer unless one of the following conditions is met:
>
> 1. The total value of all assets, including the transferred asset, does not exceed the allowed maximums.
>
> 2. Cash, services, maintenance, cancelled indebtedness or some other tangible return equal to the value of the transferred asset is received by the individual(s), child, parent or relative.
>
> The date of transfer for real estate is the date the deed is recorded. The assessed value at the time of transfer less bonafied (sic) indebtedness will be used to determine the value of the property.

A temporary restraining order was issued by a single district judge pursuant to 28 U.S.C. § 2284(3), in order to render the named plaintiffs eligible for welfare assistance *pendente lite*.[4]

## I. THREE-JUDGE COURT JURISDICTION

■ This is a suit seeking declaratory relief pursuant to 28 U.S.C. § 2201 and injunctive relief pursuant to 28 U.S.C. § 2202 and 42 U.S.C. § 1983. Jurisdiction is conferred pursuant to 28 U.S.C. § 1343(3) and (4). A three-judge court was convened pursuant to 28 U.S.C. §§ 2281 and 2284 on the basis that plaintiffs sought an injunction to restrain a state officer from enforcing a state statute and regulation of statewide application because said statute and regulation violated equal protection and due process. In addition, "since the statutory claim and the constitutional claims 'derive from a common nucleus of operative fact', . . . this Court considers it appropriate, once having assumed jurisdiction as a three-judge court on the constitutional claims, to maintain jurisdiction over the statutory claim." Story v. Roberts, 352 F.Supp. 473, 475 (M.D.Fla.1972) (Simpson, McRae and Scott, JJ.).[5]

## II. EXHAUSTION OF STATE REMEDIES

■ At the outset, this Court is met with the argument that the plaintiffs should have exhausted their state judicial remedies prior to initiating this suit. This contention has been uniformly rejected by the Fifth Circuit in Section 1983 Civil Rights Act cases. Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971); Moreno v. Henckel, 431 F.2d 1299 (5th Cir. 1970); Hall v. Garson, 430 F.2d 430 (5th Cir. 1970). In addition, as counsel for the Secretary conceded at oral argument, the time for judicial review under the state Administative Procedure Act, Fla.Stat. § 120.31, F.S.A., has long since expired. Therefore, there are no presently existing state judicial remedies to be exhausted. Therefore, this action is properly before this Court. *Cf.* Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

## III. THE CONTESTED STATUTE AND REGULATION

The net effect of the statute is that whenever a transfer of property is effected by a welfare claimant *for any reason whatsoever* within two years prior to or during receipt of assistance, the burden *automatically shifts* to the claimant to explain that the transfer was not made for the purpose of voluntarily rendering him eligible for assistance. Lack of an adequate explanation thereby results in automatic exclusion from eligibility. Fraud is thus *presumed* regardless of the circumstances under which the transfer was made, the consideration for the property so transferred, the good faith of the claimant or the intellectual and physical capability of the claimant to adequately rebut the presumption. The fact proved is the mere transfer of property. The fact presumed is the intent to defraud the Division of Family Services by voluntarily and purposefully rendering oneself eligible for welfare.

The regulation, however, accomplishes a *fait accompli* and converts this rebuttable presumption into a conclusive, irrebuttable one. The net effect of the regulation is to automatically render any

---

4. Temporary injunctive relief to the *class as a whole* was denied, however, on the grounds that the potentially disruptive administrative effects of judicial intervention into such a pervasive regulatory scheme should be postponed until a final disposition of the case. However, this Court's award of retroactive benefits (see Section VIII of this opinion) should ameliorate any harm to the class resulting from such a denial of temporary relief.

5. *See also* United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

transfer of property *worth more than $600.00* [6] *for less than its fair market value* as a failure of the second condition precedent to eligibility in the regulation. On the basis of the regulation, then, once the applicant or recipient indicates to the Division of Family Services on the initial application form or otherwise that such a transfer was made, that person is *irrevocably and absolutely foreclosed* from public assistance for two years regardless of the circumstances under which the transfer was made or the good faith of the welfare claimant.

## IV. THE NAMED PLAINTIFFS

Plaintiff Rosa Owens is an 85 year old black resident of Jacksonville, Florida. She lives with her son and daughter-in-law, is unemployed and has no source of income whatever. On or about April 12, 1972, Mrs. Owens sold her home for $1,050.00. At the time of the sale, she was receiving Old Age Assistance (OAA) from the Florida Division of Family Services (DFS). The assessed value of the property was $2,885.00. Just prior to the sale, Mrs. Owens' husband had passed away and funds were needed for his burial expenses. Of the $1,050.00 purchase price, $394.55 was paid directly to the funeral home for the burial, $330.45 was paid directly to her by the purchaser, James Sawyer, and the contract balance is apparently still outstanding and unpaid.

In August 1972 Mrs. Owens was advised by DFS that her OAA grant was to be terminated solely because she had transferred an asset worth more than $600.00 for less than its assessed value in contravention of the challenged statute and regulation, although she had no funds currently available from the sale. An administrative "fair hearing"[7] was held on September 7, 1972, pursuant to Mrs. Owens' request for an appeal. By letter dated October 26, 1972, Mrs. Owens was informed that her OAA grant and medical assistance would be cancelled effective December 1972, and that she could reapply for OAA two years from the date on which the deed to the transferred property was recorded. The state did not dispute the fact that the sole reason that Mrs. Owens transferred the property for less than its fair market value was that she needed the funds immediately to defray her husband's burial expenses and that the transfer was not effected for the purpose of keeping herself eligible for welfare assistance.

The other named plaintiff, Mrs. Willie Belle Worth, is a 54 year old black resident of Jacksonville, Florida. She is divorced, has no children and her sole source of income is a Social Security disability grant [8] (which was $84.30 per month as of July 13, 1973, the date of the first portion of the hearing on the application for a preliminary injunction) and food stamps valued at $38.00. On November 13, 1972, Mrs. Worth applied for assistance under the Aid to the Permanently and Totally Disabled Program. At that time, she informed the Division of Family Services that she sold certain business equipment in September 1972 for $200.00. The assessed value of the property, as of September 1972, was $660.00. The sole reason why she sold the business equipment was that her doctor had directed her to liquidate the business because of her health.[9]

---

**6.** $600.00, under current administrative practice of the Division of Family Services, represents the "allowed maximum" under the first condition precedent set forth in the DFS regulation.

**7.** The "fair hearing" requirement was implemented under the Social Security Act pursuant to 45 C.F.R. § 205.10, 36 Fed.Reg. 3034 (1972). States participating in the federal state welfare system must provide such "fair hearings" as a continuing obligation in order to receive federal participating funds.

**8.** Her disability grant is based on the fact that she is affected with arthritis, an ulcer, an infected liver and a gallbladder disorder. In addition, she functions with only one kidney.

**9.** See Footnote 8.

On December 11, 1972, Mrs. Worth's application was rejected for the sole reason that she had transferred an asset worth more than $600.00 for less than its assessed value. Mrs. Worth's appeal was rejected on the same basis. The Secretary did not dispute the fact that the transfer was not effected for the purpose of rendering herself eligible for welfare. Instead, the uncontradicted evidence discloses that Mrs. Worth could not secure more than $200.00 for her used furniture simply because there was no market for used furniture.

## V. THE CONSTITUTIONAL CLAIMS

Plaintiffs' constitutional claim must be bifurcated into two separate contentions: (1) that the statute is unconstitutional *as applied through the regulation,* in that the automatic ascription of the status of ineligibility, by virtue of the conclusive, irrebuttable presumption embodied in the regulation, without affording the claimant the prior opportunity to rebut that conclusive presumption is violative of due process and equal protection; and (2) that the statute itself is unconstitutional on its face, in that there is no rational relationship between the fact *proved* (the transfer of property within two years immediately prior to or during the receipt of assistance) and the fact *presumed* (the intent to defraud the welfare authorities by purposefully attempting to render oneself eligible for welfare). We conclude that these constitutional claims have merit and that both the statute and regulation must fall.

*(A)—The Regulation is Unconstitutional*

It is axiomatic that whenever a governmental body such as a welfare agency acts so as to injure an individual, the Constitution requires that the act be consonant with due process of law. It is also well settled that a governmental body, once it confers a privilege, cannot withdraw it or dispense it arbitrarily and irrationally. Bell v. Burson, 402 U. S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90

(1971); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

Applying the two-step approach of the minimum rationality standard employed in equal protection analysis where no suspect classification such as race, national origin or alienage is involved requires that we determine: (1) whether there is a permissible legislative purpose; and (2) whether the classifications employed in the legislation are rationally related to the purpose. 26 Stanford L.Rev. 155, 156, n. 9 (November 1973). We have no difficulty in deciding that the prevention of welfare fraud is a permissible legislative purpose. Our problem rests in the fact that the classification utilized by the state regulation, in applying the statute, has not been shown to reasonably advance that purpose. The regulation, as it applies the statute, arbitrarily and irrationally forecloses from eligibility for welfare assistance those individuals who have transferred an asset worth more than $600.00 for less than its assessed or fair market value without regard whatsoever for the financial need or good faith of the individual claimant. Since the financial need and the good faith of the claimant would seem to be essential to a determination of whether fraudulent intent exists, especially in the welfare context, the quasi-legislative classification simply does not serve the legislative purpose. The result, therefore, is that a patently invidious discrimination has been created which denies the members of that class the equal protection of the laws. Shapiro v. Thompson, *supra.*

The named plaintiffs represent graphic illustrations of the arbitrariness and irrationality of the classification so created. The only factor which distinguishes these named plaintiffs from other individuals who are eligible for assistance is that these plaintiffs, under economic duress, made innocuous transfers of property for less than fair market value. Yet the plaintiffs, being el-

derly, disabled, unemployed and unemployable, and plainly impoverished, were nevertheless denied assistance. The arbitrariness and irrationality of this conclusive and automatic attribution of fraudulent intent without considering such factors as economic coercion, ignorance or the good faith of the claimant plainly flies in the face of the altruistic purpose underpinning welfare legislation.

▮ Inextricably bound up with the equal protection claim is the procedural due process contention. We find no difficulty whatsoever in holding that the reflexive denial of assistance without affording the affected individuals the prior opportunity to rebut the conclusive presumption that they were purposefully attempting to avail themselves of welfare assistance is violative of procedural due process. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Sniadach v. Family Finance, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Bell v. Burson, *supra*; Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Merriweather v. Burson, 439 F.2d 1092 (5th Cir. 1971); Lage v. Downing, 314 F. Supp. 903 (S.D.Iowa 1970); Hunt v. Edmunds, 328 F.Supp. 468 (D.Minn. 1971); Caldwell v. Laupheimer, 311 F. Supp. 853 (E.D.Pa.1969); Barnett v. Lindsay, 319 F.Supp. 610 (D.Utah 1970); *Cf.* Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Therefore, we conclude that the statute is unconstitutional as it is applied through the regulation and the regulation must fall.

(B)—*The Statute is Unconstitutional on its Face*

Plaintiffs also contend that the rebuttable presumption embodied in the statute renders it unconstitutional on its face. We agree.

▮ It is well established that a legislative body may provide, by statute or ordinance, that certain facts shall be presumptive evidence of other facts. Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952); Seaboard Air Line R. Co. v. Watson, 287 U.S. 86, 53 S.Ct. 32, 77 L.Ed. 180 (1932); Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932); Bandini Petroleum Co. v. Superior Ct., 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136 (1931); Barrett v. United States, 322 F.2d 292 (5th Cir. 1963), rev'd on other grounds, United States v. Gainey, 380 U.S. 63, 85 S. Ct. 754, 13 L.Ed.2d 658 (1965); Amerada Petroleum Corp. v. 1010.61 Acres of Land, 146 F.2d 99 (5th Cir. 1944); New Port Richey v. Fidelity & D. Co., 105 F. 2d 348 (5th Cir. 1939). However, in order for a statutory rebuttable presumption to pass constitutional muster, there must be some rational connection between the fact proved and the ultimate fact to be established. Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L. Ed.2d 57 (1969); United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L. Ed.2d 210 (1965); Adler v. Board of Education, *supra*; Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); Atlantic Coast Line v. Ford, 287 U.S. 502, 53 S.Ct. 249, 77 L. Ed. 457 (1933); Bandini Petroleum Co. v. Superior Ct., *supra*; Mobile, J. & K. C. R. Co. v. Turnipseed, 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78 (1910).[10] Stated

---

10. The *Turnipseed* case is perhaps the fountainhead case as to statutory rebuttable presumptions, due process and equal protection. The Supreme Court enunciated the rule as follows:

That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection . . .

it is only essential that there shall be *some rational connection between the fact proved and the ultimate fact presumed*, and that the inference of one fact from proof of another *shall not be so unreasonable as to be a purely arbitrary mandate.* . . .

219 U.S. at 43, 31 S.Ct. at 138 (emphasis added).

otherwise, due process requires that proof of the fact upon which the statutory presumption is based must carry a reasonable inference of the ultimate fact presumed, Barrett v. United States, *supra*, "and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." Mobile, J. & K. C. R. Co. v. Turnipseed, *supra*, 219 U.S. at 43, 31 S. Ct. at 138.

■ Applying these principles to the case at hand demonstrates that the requisite rational connection does not exist. In this Court's view, it does not follow that the mere fact that a claimant transfers an asset within two years immediately prior to or during the receipt of assistance renders one presumptively likely to be attempting to defraud the welfare authorities by voluntarily making himself eligible for assistance. As a matter of fact, the converse seems true. It is infinitely more likely that a claimant is liquidating an asset for cash in order to subsist temporarily rather than for the purpose of reducing his assets in order to voluntarily and purposefully render himself eligible for public assistance. Besides economic pressures, many other considerations, including sound business practice, which have no connection at all with intent to defraud the welfare authorities, may dictate that transfer of an asset is appropriate. The "generality of experience"[11] manifestly contradicts the conclusion that fraud may be inferred from the mere transfer of property.

This conclusion is easily reached when viewed in the light of the factual circumstances surrounding the two named plaintiffs. It is undisputed that there was no intent whatsoever on the part of the two named plaintiffs to defraud the Division of Family Services. Their good faith and desperate financial need were not challenged. Yet Mrs. Owens and Mrs. Worth were utterly foreclosed from welfare relief.

The fact that, under the statute, claimants are technically permitted to rebut the presumption does not eliminate the vice, since those persons to whom the presumption is directed are typically the least capable socially, intellectually, economically and physically to employ the means to rebut the presumption. The typical honest welfare recipient, especially one seeking to qualify for Old Age Assistance or Aid to the Totally and Permanently Disabled, is probably incapable of effectively utilizing the opportunity to rebut the presumption; whereas the atypical individual with fraudulent motivations would be much more likely to circumvent the eligibility requirements entirely. Thus, there appear to be three vices inherent in the presumption that render it violative of due process and equal protection: (1) it operates to foreclose from assistance those claimants that are possibly most deserving of it; (2) it attaches malevolent significance to an essentially innocuous act; and (3) it thrusts the burden of explanation for the innocuous act on the wrong party.

Defendants contend, however, that this presumption is a particularly effective device in preventing the type of fraud where the asset is liquidated for cash (possibly by sale to a straw man such as a relative), and the resulting proceeds are quickly dissipated, so that the claimant is rendered voluntarily impoverished and thus eligible for assistance. This assertion does not withstand scrutiny when viewed in the light of the fact that the Division of Family Services employs thousands of highly trained caseworkers who are specially skilled in ferreting out the "welfare cheaters". These caseworkers could investigate those individuals who have transferred assets under suspicious circumstances which have been made known to the caseworker by means of inquiries at the initial application stage. The Division of Family Services does not need the cumbersome, overbroad and arbitrary

11. *Id.* at 42, 31 S.Ct. 136.

device employed herein in order to prevent fraud.

We conclude, therefore, that the rebuttable presumption embodied in Section 409.185(1)(b) of the Florida Statutes, F.S.A. renders that section violative of due process and equal protection.[12]

## VI. THE STATUTE AND REGULATION ARE INCONSISTENT WITH THE SOCIAL SECURITY ACT

 Plaintiffs also assert that the statute and regulation are fatally inconsistent with the Social Security Act, 42 U.S.C. § 301 et seq., and the regulations promulgated thereunder, in that they create additional eligibility requirements for assistance which are not authorized by the Social Security Act. We find the plaintiffs' position to be unexceptionable and hold that the statute and regulation must also fall under the Supremacy Clause.

Section 302(a)(8) of Title 42 provides that a State Plan for Old Age Assistance (OAA) must provide that "such assistance shall be furnished with reasonable promptness to *all eligible individuals*." (emphasis added) To the same effect for State Plans for Aid to Families with Dependent Children (AFDC) and Aid to the Totally and Permanently Disabled (AD) are Sections 602(a)(9) and 1352(a)(10) of Title 42. The applicable implementing regulation as to eligibility is 45 C.F.R. § 233.10 (1972). Subsection (a)(1)(i) of that section specifically states that a state "may not impose any eligibility condition that is prohibited under the Social Security

Act". Subsection (a)(1)(ii) provides that:

The groups selected for exclusion in the plan and the eligibility conditions imposed must not exclude individuals or groups on an arbitrary or unreasonable basis, and must not result in inequitable treatment of individuals or groups in the light of the provisions and purposes of the public assistance titles of the Social Security Act.

Subsection (a)(1)(vii) provides that "methods of determining eligibility must be consistent with *the objective of assisting all eligible persons to qualify*". (emphasis added) Subsection (a)(1) of 45 C.F.R. § 233.20 (1972) also provides that a state plan must "provide that the determination of need and amount of assistance for all applicants and recipients will be made on an objective and equitable basis and *all types of income will be taken into consideration in the same way except where otherwise specifically authorized by Federal statute*". (emphasis added) Subsection (2) of Section 233.10 states that federal financial participation will be available to all "needy" persons under the various plans who are otherwise aged, disabled, blind or who have families with dependent children.

The foregoing examination of the congressional and administrative framework leaves us with the firm conclusion that the challenged state statute and regulation impose a condition precedent to eligibility not countenanced by the Social Security Act. Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L. Ed.2d 448 (1971). In addition, the state transfer of assets provisions are fatally inconsistent with the federally mandated

---

12. It would appear that the first sentence in subsection (b) of Section 409.185(1)(b) ("Have not made an assignment or transfer . . . for the purpose of rendering or keeping himself eligible for assistance under this chapter".) is both constitutionally permissible and, in addition, consistent with the Social Security Act and the accompanying HEW regulations. Therefore, it would probably be possible to resurrect this partic-ular language upon reenactment as long as the particular rebuttable presumption at issue herein is not employed. The reason we struck down the entire subsection instead of only excising the presumption so as to leave the first sentence intact was that we were unable to detect the extent to which the presumption was an integral part of the entire scheme of that subsection.

"objective in assisting all eligible persons to qualify". Nowhere in the Social Security Act or in the HEW regulations is there any intimation that the mere transfer of assets within two years prior to or during the receipt of assistance is to operate as a lever which thrusts the burden of explanation therefor on the applicant. The only factors in determining whether a claimant is "needy" are income and the amount of currently retained assets. 45 C.F.R. § 233.20 (1972). Failure to adequately explain why an asset was transferred is not a determinative factor. Therefore, under these HEW regulations, if a person does not possess the threshold amount of resources and his income falls below a certain level, he is qualified for assistance regardless of whether there has been a recent transfer of an asset, assuming that person is otherwise aged, blind, disabled or has a family with dependent children.

When fraud is suspected, the state is guided by the standards of subsection (b) of 45 C.F.R. § 235.110 (1972) which states that state plans must provide "for methods of *investigation* in which there is a question of fraud, *that do not infringe on the legal rights of persons involved and are consistent with the principles of due process of law*". (emphasis added) This subsection thus indicates two things: (1) that an affirmative duty to investigate fraud is thrust upon the *state welfare authorities* and that the burden is *not* on the individual claimant to explain to the satisfaction of the welfare authorities that there has been no fraud because of a mere innocent transfer of property; and (2) that the constitutional rights of the individual claimants are to be protected by the

state in any fraud investigation. Subsection (c) denotes the remedy for suspected welfare fraud by requiring that the state plan provide "for the designation of official position(s) for referral of situations involving suspected fraud to the proper authorities". This subsection strongly suggests that the remedy for suspected welfare fraud is *not* the wholesale denial of eligibility to all those claimants who transfer assets within a certain period of time regardless of the existence of fraudulent intent but is, instead, the affirmative referral of suspect cases to the "proper authorities" (meaning the state attorney's office). With this in mind, it should be further noted that Section 409.325 of the Florida Statutes imposes criminal sanctions for committing fraud to obtain welfare assistance.

■■■■ In conclusion, we hold that Fla.Stat. § 409.185(1)(b), F.S.A. and DFS Reg., Section II, Ch. V, relating to the transfer of assets is fatally inconsistent with the Social Security Act and the regulations promulgated thereunder and must fall under the Supremacy Clause. Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Story v. Roberts, 352 F.Supp. 473 (M. D.Fla.1972); Silvey v. Roberts, 363 F. Supp. 1006 (M.D.Fla.1973).[13]

## VII. THE AFFECTED CLASS

■■■■ Having decided that the plaintiffs are entitled to prevail on the merits in this case, we must now define the scope of the affected class[14] for pur-

---

13. Defendants' argument that the state statute and regulation are useful in preserving the fiscal integrity of its welfare program is unavailing. As pointed out in Townsend v. Swank, *supra,* 404 U.S. at 291–292, 92 S.Ct. 502, a state's interest in preserving the fiscal integrity of its welfare program by economically allocating limited resources may not be protected by the device of adopting eligibility requirements restricting the class

of persons made eligible by federal standards. That interest may be protected by the state's undisputed discretion to set the level of benefits.

14. The viability *vel non* of the instant case as a class action has been mildly contested by the defendants. However, we do not feel that this particular question is sufficiently in doubt to warrant extensive discussion. Suf-

poses of prospective relief. We find that the affected class consists of all those Florida residents, who would otherwise have been eligible for state public welfare assistance but for the fact that they transferred an asset within two years immediately prior to or during the receipt of assistance in contravention of Fla.Stat. § 409.185(1)(b), F.S.A. and the regulations promulgated thereunder.

## VIII. RETROACTIVE BENEFITS

Having decided that the plaintiffs are entitled to injunctive and declaratory relief, we are now confronted with the question of whether members of the affected class are entitled to retroactive benefits. As was pointed out in Silvey v. Roberts, supra, 363 F.Supp. at 1013, there are two fundamental hurdles to be overcome before retroactive benefits can properly be awarded.

The first hurdle is the Eleventh Amendment. In four separate three-judge court opinions which rejected the argument that the Eleventh Amendment bars a federal district court from compelling state officials to make retroactive payment of welfare funds which were wrongfully withheld, appeals were taken to the Supreme Court, specifically raising the point. The Supreme Court affirmed in each case without discussing the issue. Sterrett v. Mothers & Childrens Rights Organization, 409 U.S. 809, 93 S.Ct. 68, 34 L.Ed.2d 70 (1972), affirming unreported order and judgment, Civil No. 70 F. 138 (N.D.Ind. April 14, 1972) on remand from Carpenter v. Sterrett, 405 U.S. 971, 92 S.Ct. 1199, 31 L.Ed.2d 246 (1972); State Dept. of Health and Rehabilitative Services v. Zarate, 407 U.S. 918, 92 S.Ct. 2462, 32 L.Ed.2d 803 (1972), summarily affirm-

ing Zarate v. State Dept. of Health and Rehabilitative Services, 347 F.Supp. 1004 (S.D.Fla.1971); Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed. 2d 38 (1970), aff'g per curiam, Gaddis v. Wyman, 304 F.Supp. 717 (S.D.N.Y. 1969); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), aff'g 270 F.Supp. 331 (D.Conn. 1967). Partially on the basis of these affirmances, two cases arising out of the Jacksonville Division of the Middle District of Florida squarely held that the Eleventh Amendment was not a bar. Story v. Roberts, 352 F.Supp. 473 (M. D.Fla.1972); Silvey v. Roberts, 363 F. Supp. 1006 (M.D.Fla.1973).

It appears, however, that this issue is now again before the Supreme Court. In the case of Jordan v. Weaver, 472 F.2d 985 (7th Cir. 1973), upon which the Story and Silvey cases primarily relied in awarding retroactive benefits, certiorari was granted specifically on the Eleventh Amendment question. Edelman v. Jordan, 412 U.S. 937, 93 S.Ct. 2776, 37 L.Ed.2d 398 (1973). However, in the absence of a Supreme Court decision to the contrary, we still hold that the Eleventh Amendment does not erect a bar to a court-ordered payment of wrongfully withheld welfare benefits. Note, 7 Ga.L.Rev. 366, 381 (1973).[15]

Regardless of whether the Eleventh Amendment would create a bar *generally* in such cases, we conclude that the State of Florida has waived whatever Eleventh Amendment immunity it is entitled to, if any, by its participation in the federal-state welfare programs. Parden v. Terminal R. Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); *But cf.* Employees of the Department of Public Health & Welfare v. Department

---

fice it to say, we conclude that the Rule 23 prerequisites to a class action have been satisfied. Although the defendants argued that the claims of the plaintiffs were atypical of the claims of the class, they never attempted to demonstrate beyond mere conclusory observations that such was the case.

15. It should be pointed out that in neither the *Story* case nor the *Silvey* case did the State of Florida take an appeal. In addition, the state did not raise the issue in these proceedings. On this basis, it would appear that the state itself no longer seriously seeks to invoke the Eleventh Amendment as a jurisdictional barrier.

of Public Health & Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973).

This conclusion is reached primarily on the basis of a close examination of certain of the regulations promulgated under the Social Security Act. As noted previously, the Social Security Act imposes an affirmative obligation upon all participating states, including the State of Florida, to furnish public assistance under the various state plans "with reasonable promptness to all eligible individuals". 42 U.S.C. §§ 302(a)(8), 602(a)(9), and 1352(a)(10). An HEW regulation promulgated pursuant to the Act, 45 C.F.R. § 205.10 (1972), imposes an additional affirmative burden upon participating states to provide for a system of "fair hearings" for welfare claimants. One purpose of these "fair hearings" is to review the correctness of an initial agency determination of ineligibility. 45 C.F.R. § 205.10(3)(iv)(c)(1) (1972). Subsection (13) of that section provides that, as one mandatory ingredient in any state plan submitted to and accepted by HEW:

> When the hearing decision is favorable to the claimant, or when the agency decides in favor of the claimant prior to the hearing, *the agency will make corrective payments retroactively to the date the incorrect action was taken* or such earlier date as is provided under State policy.

Subsection (b)(1)(2) and (3) of that section provides as follows:

> (b) *Federal Financial Participation.* Federal financial participation is available for the following items:
>
> (1) Payments of assistance continued pending a hearing decision;
>
> (2) Payments of assistance made to carry out hearing decisions, or to take

corrective action after an appeal but prior to hearing, or to extend the benefit of a hearing decision *or court order to others in the same situation as those directly affected by the decision or order.* Such payments may be made *retroactive* in accordance with applicable federal policies on corrective payments.

(3) Payments of assistance within the scope of federally aided public assistance programs *in accordance with a court order.*

(emphasis added)

The foregoing convinces us that court-ordered retroactive welfare payments were clearly contemplated by Congress in enacting this federal-state welfare legislation, as interpreted by the administrative agency charged with implementing such legislation, whenever participating states misapplied or ignored existing statutory or constitutional law so as to wrongfully withold public assistance to deserving welfare claimants. This is so because, as a general matter, a contemporaneous construction of a statute by the administering agency is entitled to great weight and will be shown great deference. FTC v. Mandel Bros., 359 U.S. 385, 79 S.Ct. 818, 3 L. Ed.2d 893 (1959); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Leary v. United States, 395 U. S. 6, 25, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); Townsend v. Swank, 404 U.S. 282, 286, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971). In addition, nothing in the statute itself is inconsistent with the administrative interpretation accorded by HEW in this regard.[16] Thus, we are left with the unchallenged conclusion that the State of Florida, by voluntarily participating in these various state plans such as OAA, AABD and AFDC and thus acceding to the regulations nec-

16. HEW has proposed specific legislation to require retroactive benefits in cases of nonconforming state statutes. However, this does not alter the fact that nothing in the present statute conflicts with the HEW interpretive regulation that authorizes court-ordered retroactive payments and makes them a necessary component in a qualifying state plan. It does seem to indicate, however, that HEW considers such a remedy necessary to effectuate the intent of the present statute. *See Note,* 7 Ga.L.Rev. 366, 382 (Winter 1973).

essarily accompanying said participation, has voluntarily accepted the possibility of being subjected to court-ordered retroactive payments. This would seem particularly true where the state has not only exceeded federal *statutory* constrictions but also has proceeded in violation of the federal Constitution.

The following language from Jordan v. Weaver, *supra*, seems particularly apt in this regard:

> Certainly we are not to be understood as meaning that retrospective relief is always or even generally an appropriate remedy. However, the spectre of a state, perhaps calculatingly, defying federal law and thereby depriving welfare recipients of the financial assistance Congress thought it was giving them convinces us that Congress fully meant to condition the grant of federal funds on the states' being susceptible to a federal court suit to obtain retrospective relief. Simply put, we think it unreasonable to presume that Congress would have intended assistance to be given to welfare recipients in conformity with federal law and at the same time deprive them the possibility of gaining an effective remedy.
>
> . . . . . .
>
> We cannot conceive that Illinois could legitimately expect to be able to participate in the federal program, receive federal funds in consideration for its agreement to channel them, together with state funds, to beneficiaries in compliance with federal law, . . . and invariably retain the savings accruing through that illegality. Thus as a matter of federal law Illinois has constructively consented to this suit.' . . . (citing cases)

472 F.2d 995. We think this reasoning applies here and we therefore hold that the State of Florida has waived any immunity to a court-ordered award of wrongfully withheld retroactive benefits.

## IX. THE MERITS OF RETROSPECTIVE RELIEF

The second hurdle to be overcome is whether the equities favor such a retroactive award. It has been held that court-ordered retroactive payments potentially serve three congressional interests: (1) to deter wilful state violations of federal requirements; (2) to promote the federal policy of satisfying the ascertained needs of impoverished persons; and (3) as grantor, to insure the proper use of federal funds. Rothstein v. Wyman, 467 F.2d 226, 234–235 (2d Cir. 1972), cert. denied 411 U.S. 921, 93 S.Ct. 1552, 36 L.Ed.2d 315, reh. denied 411 U.S. 988, 93 S.Ct. 2276, 36 L.Ed.2d 966 (1973); Silvey v. Roberts, *supra*, 363 F.Supp. at 1014–1015; Story v. Roberts, *supra*, 352 F.Supp. at 476–477; *See Note*, 7 Ga.L.Rev. 366, 384–381 (Winter 1973). We agree with this analysis and adopt it as our own.

As to the first congressional interest in deterring wilful state violations of federal requirements, we feel that the state violations occurring in this case are not such as to be labelled "wilful". Although the challenged state statute and regulation in this case are clearly inconsistent with the Social Security Act and the applicable HEW regulations and, in addition, violative of due process and equal protection, we cannot infer that the State of Florida's actions were designed, deliberate or premeditated. Although it could be argued that the state acted negligently, an award of retroactive payments would probably not serve as a deterrent to violations of that kind.

We do feel, however, that the other two congressional interests previously enunciated are ably served by a retroactive award in this case and we hold, therefore, that benefits shall be awarded to the affected class retroactively to the date this lawsuit was filed. The second congressional interest potentially served, *i. e.*, the federal policy of satisfying the ascertained needs of impoverished persons, is served in this case because the relatively short period of time between the date to which retroactive payments will be made (May 31, 1973, the date this lawsuit was filed)

and the date of this order renders such payments "remedial" rather than "compensatory". *See* Rothstein v. Wyman, *supra*, 467 F.2d at 235. Lastly, the congressional interest in assuring the proper utilization of granted funds is served in that, as pointed out above, the HEW regulations clearly contemplate court-ordered retroactive payments in order to effectuate the purpose of the Social Security Act.

Therefore, we conclude that the equities justify an award of retroactive benefits. Further, we hold that the most appropriate cutoff point for determining the extent of a retroactive award under the circumstances is the date of the filing of this lawsuit: May 31, 1973. The reason for this particular date is that we cannot infer that the defendants were formally put on notice as to the illegality of their actions prior to that juncture. In addition, to extend the effective date of the award any further into the past would convert the remedial nature of the award into a compensatory one so as to render it inconsistent with the congressional interest in satisfying the ascertained needs of impoverished persons. Therefore, we hold that the award shall be made retroactive to May 31, 1973, the date this cause was initiated.

This opinion contains the requisite findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.

A separate final decree will be entered in favor of the plaintiffs consistent herewith.

## FINAL DECREE

This cause having come on for final hearing before the three-judge court, documentary evidence having been introduced and testimony taken, and an opinion entered herein today, it is, therefore,

Ordered:

1. Section 409.185(1)(b) of the Florida Statutes, F.S.A., and Florida Division of Family Services Regulation, Ch. V, § II, relating to the transfer of assets as an exclusion from eligibility, are inconsistent with the Social Security Act, 42 U.S.C. § 301 et seq., and the regulations promulgated thereunder, and are hereby declared invalid under the Supremacy Clause of the United States Constitution.

2. Said state statute and regulation are also hereby declared invalid under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

3. Defendant Oliver J. Keller, Secretary, Department of Health and Rehabilitative Services, State of Florida, and his successors, are hereby permanently enjoined from enforcing and implementing Fla.Stat. § 409.185(1)(b), F.S.A., and the regulations promulgated thereunder.

4. Plaintiffs, all Florida residents who would have been eligible for welfare assistance but for the fact that they transferred an asset within two years immediately prior to or during the receipt of assistance in contravention of Fla.Stat. § 409.185(1)(b), F.S.A., and the regulations promulgated thereunder shall be entitled, if otherwise eligible, for all benefits wrongfully withheld retroactive to May 31, 1973.

5. Defendant Oliver J. Keller, Secretary, Department of Health and Rehabilitative Services, is hereby required to tender to plaintiffs within ninety (90) days from the date of this order the benefits unlawfully withheld from them since May 31, 1973.

6. This Court retains jurisdiction of this case pending the furnishing to this Court of written assurances under oath by defendants within 120 days from the date of this order that said benefits have been tendered to plaintiffs as directed by this order.

7. All costs in this action are hereby taxed against the defendants.

## ON MOTION TO AMEND JUDGMENT

Before SIMPSON, Circuit Judge, and YOUNG and SCOTT, District Judges.

PER CURIAM.

This cause came before this Court with respect to the motion to alter or amend final judgment, filed herein March 11, 1974, by defendant Oliver J. Keller, Secretary, Department of Health and Rehabilitative Services. For the reasons set forth below, we conclude that the motion should be granted.

On February 28, 1974, this Court entered a final decree which declared Section 409.185(1)(b) of the Florida Statutes, F.S.A., and the state administrative regulations promulgated thereunder, relating to the transfer of assets as an exclusion from eligibility, to be invalid under the Supremacy Clause, because of inconsistency with federal statutes and regulations, and, in addition, to be unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The defendant Secretary was enjoined from enforcing said Florida statute and regulations and, in addition, was required to pay retroactive benefits to the members of the affected class back to the date the lawsuit was filed, May 31, 1973.

The defendant's first contention is that this Court erred in awarding retroactive benefits to the members of the affected class. This claim is clearly meritorious in view of the recent decision of the Supreme Court of the United States in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which held that the Eleventh Amendment operates as a bar to the payment of retroactive welfare benefits.

The defendant's second contention, which presents a great deal more difficulty, is that the state should not be required to identify the members of the affected class for the purpose of "grandfathering" them into the Federal Supplemental Security Income Program (hereinafter referred to as SSI), which, as of January 1, 1974, assumed responsibility for the state Aid to the Aged, Blind and Disabled Program (AABD) pursuant to 42 U.S.C. § 1382(a)–(g). Under these recent amendments to the Social Security Act, those aged, blind and disabled members of the affected class who would have been eligible during December 1973, are automatically rendered eligible for direct federal benefits under the SSI program. The plaintiffs contend that unless the defendant is required to identify those individuals who would have been eligible for state AABD benefits but for the defendant's unlawful action, there is no way to determine whether these admittedly eligible class members are being foreclosed from benefits under the recently implemented federal program.

The defendant asserts, however, that the expenditures required in searching for these class members would be inordinate when compared to the relatively few individuals that would be identified. In support of this assertion, the defendant submitted affidavits which demonstrate that it would cost the state approximately $600,000.00 to search 250,000 open and closed files to identify the individuals affected for the purpose of grandfathering them in under the SSI program. In addition, the defendant asserts that the estimated number of those actually affected would be only approximately 134 people.

The defendant also submitted affidavits that delineated the efforts that the state is making to apprise the members of the class of their eligibility for SSI. The affidavits demonstrate that the State Department of Health and Rehabilitative Services, in conjunction with the United States Department of Health, Education and Welfare, embarked on a cooperative program specifically designed to notify the aged, blind and disabled of their eligibility under the program. Enlisted in this effort are the Red Cross, the American Association of Retired Persons, Retired Federal Employees Association, the National Caucus on the Black Aged, churches, radio and television stations, and other groups. Such notification is taking the form of published notices in newspapers, house to house interviews, radio and television announcements, notices in church bulletins, and various other means.

Although the Court hesitates to accept the foregoing statistics at full face value because of their self-serving nature, the record, nevertheless, stands uncontroverted and we are reluctantly compelled to conclude that, on balance, the cost of searching the records, in comparison with the number of persons to be identified, is disproportionately high. In addition, the record indicates that the state has made a good faith effort to apprise the members of the class of their eligibility for SSI.

Therefore, in considering: (1) the costs estimated by the state ($600,-000.00) in searching approximately 250,-000 records, (2) the relatively few recipients to be affected by the search (approximately 134 persons), (3) the alternative means employed in notifying the members of the affected class of their rights under SSI by advertising, etc., (4) the diminution in benefits to other welfare recipients because of the expenditure of these costs, and (5) the lack of bad faith on the part of the welfare officials, we conclude that the defendant should be relieved of his burden of identifying the class for the sole purpose of grandfathering them into the SSI program.

Although the plaintiffs in this case are the least capable intellectually, physically and economically to assert their rights, any prejudice which would accrue to them seems to be vitiated to a large extent by the positive steps taken by the state to apprise them of their rights. Any residual prejudice which does exist seems to be outweighed by the enormous expenditures which would be necessitated to extirpate that prejudice.

Therefore, it is

Ordered:

1. The motion to alter or amend judgment, filed herein March 11, 1974, by the defendant Secretary, is hereby granted.

2. Paragraphs four through six of this Court's final decree, entered herein February 28, 1974, are hereby withdrawn and revoked.

3. This case is hereby dismissed.